801 So.2d 59 (2001)
Kenneth Allen STEWART, Appellant,
v.
STATE of Florida, Appellee.
No. SC96177.
Supreme Court of Florida.
September 20, 2001.
Rehearing Denied November 26, 2001.
*62 Harry P. Brody, Assistant CCRC-Middle, and Jeffrey M. Hazen, CCRC-Middle Attorney, Capital Collateral Regional Counsel-Middle, Tampa, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Carol M. Dittmar, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
Kenneth Allen Stewart, an inmate under sentence of death, appeals an order entered by the trial court denying his motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the trial court's order denying postconviction relief.

I. FACTUAL AND PROCEDURAL HISTORY
In 1986, Stewart was convicted of first-degree felony murder, attempted second-degree murder with a firearm, robbery with a firearm, and arson. In brief, the evidence established the following:
In April 1985, Michele Acosta and Mark Harris picked up appellant, Kenneth Stewart, while he was hitchhiking. When Acosta stopped to drop Stewart off, he struck her on the head with the butt of a gun and fired three shots, hitting Acosta in the shoulder and Harris in the spine. Stewart then forced Acosta and Harris from the car before driving off and picking up a friend, Terry Smith. The two removed items from the car's trunk and Stewart burned the car after telling Smith that the car belonged to a woman and a man whom he had shot. Acosta recovered from her injuries; Harris later died.
Stewart v. State, 549 So.2d 171, 172 (Fla. 1989).[1]
Following the penalty phase of the trial, the jury recommended death and the trial court imposed the death penalty. The trial court found two aggravating factors: (1) that Stewart had prior violent felony convictions (attempted first-degree murder, attempted second-degree murder with a firearm, and armed robbery); and (2) that the murder was committed during the course of a robbery. In mitigation the trial court found: (1) that the murder was committed under the influence of extreme mental or emotional disturbance; (2) Stewart's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially *63 impaired; (3) Stewart's age at the time of the offense was twenty-one. The court accorded these mitigating factors little or slight weight.
On appeal, this Court affirmed Stewart's convictions, but remanded the case so that the trial court could provide written findings in support of its imposition of the death penalty and its departure from the sentencing guidelines in imposing a life sentence for the attempted second-degree murder conviction. See Stewart, 549 So.2d at 177. On remand, the trial court reduced to writing its findings on aggravation and mitigation in support of the death sentence, which this Court affirmed on appeal. See Stewart v. State, 588 So.2d 972 (Fla.1991).[2]
On August 2, 1993, Stewart filed his initial motion for postconviction relief. Stewart subsequently amended that motion, filing the present version on September 17, 1996, raising twenty-four claims.[3] The trial court summarily denied the bulk of Stewart's claims as procedurally barred or insufficiently pled.[4] The trial court held *64 an evidentiary hearing on Stewart's remaining claims: (1) ineffective assistance of counsel during the pretrial and guilt phases; (2) State's failure to produce jail records in violation of Brady;[5] (3) inadequate mental health assistance; and (4) ineffective assistance of counsel during the penalty phase. Following the evidentiary hearing, the trial court denied Stewart relief.

II. APPEAL
Stewart raises the following ten issues in this appeal: (1) ineffective assistance of counsel during the guilt and penalty phases; (2) State failed to produce jail records in violation of Brady; (3) penalty phase jury instructions diminished the jury's sense of responsibility in violation of Caldwell; (4) penalty phase jury instructions shifted burden to Stewart to prove that death sentence was inappropriate in violation of Caldwell; (5) death sentence rests on unconstitutional automatic aggravating circumstance; (6) statute setting forth aggravating factors is vague and overbroad; (7) vague and overbroad prosecutorial argument on aggravating circumstances and ineffectiveness of counsel for failing to object to the same; (8) shackling during trial and penalty phase denied Stewart fair trial; (9) capital sentencing statute is unconstitutional on its face and as applied; and (10) cumulative error.

III. ANALYSIS
At the outset, we dispose of several claims because they are procedurally barred or clearly without merit as a matter of law.[6] We now turn to address the remainder of the claims.

A. Ineffective Assistance of Counsel
Stewart alleges trial counsel was ineffective in: (1) failing to employ voluntary intoxication as a defense and as mitigation; (2) failing to investigate and present evidence of Stewart's alleged childhood abuse; (3) failing to obtain Stewart's jail records; and (4) failing to adequately prepare Stewart's mental health expert.
For Stewart to succeed in his ineffectiveness claims he must satisfy two elements:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that *65 the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also State v. Riechmann, 777 So.2d 342, 349 (Fla.2000); Downs v. State, 740 So.2d 506, 515 (Fla.1999); Rutherford v. State, 727 So.2d 216, 219 (Fla.1998). Additionally, and because the Strickland standard requires establishment of both prongs, when a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong. See 466 U.S. at 697, 104 S.Ct. 2052 ("[T]here is no reason for a court deciding an effective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one."); see, e.g., Downs v. State, 740 So.2d 506, 518 n. 19 (Fla.1999) (finding no need to address prejudice prong where defendant failed to establish deficient performance prong).

Failure to Employ Voluntary Intoxication Defense
First, Stewart claims that trial counsel was ineffective in failing to employ a voluntary intoxication defense or request a jury instruction on the defense. We disagree. Claims expressing mere disagreement with trial counsel's strategy are insufficient: "Counsel cannot be deemed ineffective merely because current counsel disagrees with trial counsel's strategic decisions. Moreover, strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000) (citations omitted). The record of both the evidentiary hearing and trial demonstrates that trial counsel considered a voluntary intoxication defense but rejected it for strategic reasons.
During the evidentiary hearing, Stewart's trial counsel, Rex Barbas, testified that he considered the defense of voluntary intoxication given the fact that some of the evidence in the case indicated that Stewart had been drinking on the day of the offense, but opted against it after determining it was not a viable defense for Stewart. Specifically, Barbas testified that his conversations with Stewart persuaded him that voluntary intoxication defense would be inappropriate given Stewart's detailed account of the crime, which included a statement to Barbas that he planned to shoot and rob the victims.
Moreover, Barbas testified that further militating against the employment of a voluntary intoxication defense was the State's potential use of the experts who examined Stewart to determine his competency to stand trial. Drs. Mussenden and Gonzalez would have been available to testify about Stewart's detailed account of the circumstances of the crime. Barbas concluded that such testimony would more than negate any potential benefit of a voluntary intoxication defense.
In sum, the record demonstrates that counsel made an informed and reasoned decision not to pursue a voluntary intoxication defense. See Occhicone, 768 So.2d at 1048 (affirming denial of petitioner's ineffectiveness claim for counsel's failure to present additional evidence in support of voluntary intoxication defense where defense counsel testified that they chose against presenting the additional evidence because of taped statements made by the petitioner to a psychologist which demonstrated that the defendant "had a good recall of what transpired the night of *66 the murders and therefore was not intoxicated to the level of not being able to premeditate the murders"); Johnson v. State, 593 So.2d 206, 209 (Fla.1992) (holding that counsel's decision not to pursue voluntary intoxication defense was a strategic decision, not deficient performance, where defense counsel testified that he rejected the defense because the defendant "recounted the incident with `great detail and particularity' in his confession").[7]

Failure to Investigate
Stewart next contends that trial counsel was deficient for failing to investigate and present evidence of Stewart's alleged childhood abuse at the hands of his stepfather, Bruce Scarpo. We disagree.
In further explaining the "deficiency" prong of the ineffectiveness of counsel test, we have recognized that "the defendant must show that counsel's representation fell below an objective standard of reasonableness" based on "prevailing professional norms." Cherry v. State, 781 So.2d 1040, 1048 (Fla.2000) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052). "In evaluating this prong, courts are required to ... make every effort to eliminate the distorting effects of hindsight by evaluating the performance from counsel's perspective at the time." Blanco v. State, 507 So.2d 1377, 1381 (Fla.1987). Moreover, "[t]here is a `strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" Asay v. State, 769 So.2d 974, 984 (Fla.2000) (quoting Strickland, 466 U.S. at 689, 104 S.Ct. 2052).
"[A]n attorney has a strict duty to conduct a reasonable investigation of a defendant's background for possible mitigating evidence." Riechmann, 777 So.2d at 350 (emphasis added) (citing Rose v. State, 675 So.2d 567, 571 (Fla.1996)). We have also said, "The failure to investigate and present available mitigating evidence is a relevant concern along with the reasons for not doing so." Rose, 675 So.2d at 570 (citing Hildwin v. Dugger, 654 So.2d 107, 109-10 (Fla.1995)).
In this instance, the record clearly establishes that defense counsel Barbas' actions in preparation for Stewart's penalty phase were nothing short of reasonable. Barbas hired two investigators, Sonny and Diane Fernandez (both, as the trial court noted in its order, "very experienced in researching and investigating mitigation issues for capital cases") to investigate Stewart's case in both the guilt and penalty phases.[8] Sonny Fernandez indicated he *67 interviewed both of Stewart's stepsisters prior to the penalty phase hearing. At no time did either one of them mention any abuse of Stewart at the hands of his stepfather. Fernandez indicated he would normally seek such information during the penalty phase and that his notes would reflect any affirmative responses by either of the stepsisters with regards to abuse by Scarpo; however, Fernandez's witness information sheets contained no indication that either of them stated that Scarpo abused them or Stewart.[9]
In addition, Barbas testified that he personally interviewed potential witnesses, including Stewart's stepsisters, his aunt, his grandparents, and Lasha LaRue (a family friend). Barbas specifically indicated that he talked with both of Stewart's stepsisters prior to the penalty phase, but neither one ever mentioned that Scarpo had abused them or Stewart. Scarpo, himself, never led Barbas to believe anything other than that Scarpo was a loving and caring father to Stewart.
Furthermore, this Court has recognized, "the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Cherry, 781 So.2d at 1050 (quoting Strickland, 466 U.S. at 691, 104 S.Ct. 2052). Barbas testified that, in his discussions with Stewart, Stewart generally described a happy childhood in his time with Scarpo and that Stewart never told him that he suffered any type of abuse by Scarpo. Nor did Stewart ever contradict Scarpo's accounts that Stewart had a very happy home life with him. Moreover, the defense psychiatrist, Dr. Afield, met with Stewart three times prior to the penalty phase, and Stewart mentioned nothing about abuse in the Scarpo household, nor was there any information about it in any of the other doctor's reports examined by Afield.[10] Therefore, by failing to communicate to defense counsel (or the defense psychiatrist) regarding any instances of childhood abuse, Stewart may not now complain that trial counsel's failure to pursue such mitigation was unreasonable. See Cherry, 781 So.2d at 1050.
Additionally, defense counsel's alleged inaction in the instant case, i.e., "failing to pursue the potential evidence of Scarpo's abuse of Stewart," is in stark contrast to the inactions by defense counsels in those cases where this Court found counsel's representation deficient.[11] In these cases, and in contrast to the instant case, defense *68 counsel failed to investigate or present any mitigation.[12]
In this instance, trial counsel conducted a reasonable investigation, presented appropriate penalty phase evidence, and forcefully argued for the jury to recommend sparing Stewart's life. Thus, the investigation and presentation of mitigating evidence in this case was well within the realm of constitutionally adequate assistance of counsel.[13]

Failure to Obtain Records
Stewart also alleges that his attorney was ineffective for failing to obtain and present jail records detailing several suicide attempts by Stewart. During the evidentiary hearing, however, Barbas testified that he had seen all the jail records indicating that Stewart had attempted suicide and recalled having reviewed associated medical treatment records. Furthermore, Stewart's mental health expert testified at the evidentiary hearing that he was aware of the suicide attempts and considered that fact in his diagnosis that Stewart was suffering from major depression.[14] Accordingly, we find no merit to Stewart's claim.

*69 Failure to Prepare Mental Health Expert

Stewart next argues that attorney Barbas inadequately prepared Stewart's mental health expert to testify at the penalty phase of Stewart's trial. As to this claim, we agree with the trial court, which found that counsel's preparation of the defense's mental health expert, Dr. Afield, was not deficient:
In this ground, Defendant alleges that Dr. Afield was called in at the last minute as the defense's mental health expert and was not properly prepared. Dr. Afield testified that he had previously been certified as an expert in the fields of psychiatry, neuropsychology, and neurology several hundred times. According to Dr. Afield's bills, he testified that he interviewed Defendant three or four times prior to trial. On cross-examination, Mr. Chalu refreshed Mr. Barbas's recollection regarding the number of times Dr. Afield had seen Defendant prior to trial. Mr. Chalu reviewed Dr. Afield's testimony in the penalty phase transcript as to when Dr. Afield first met Defendant. Dr. Afield stated that he met Defendant the week of August 11th, and saw him three times prior to trial. Dr. Afield also reviewed numerous medical records and documents prior to trial.
Mr. Barbas testified that Dr. Afield got his information about Defendant from his interviews with Defendant himself, from Mr. Barbas' interviews with friends and family members, and from the court testimony that Dr. Afield heard. Mr. Barbas also met with Dr. Afield before the [sic] testified at trial. In addition to his interviews of Defendant, he also did psychological and neurological testing of Defendant. Although he found Defendant to be disturbed, he found no evidence of brain damage or psychosis. He diagnosed Defendant as having major depression. He also testified that he was aware of Defendant's alcoholism and drug abuse, as well as Defendant's suicide attempts, major depression, and anti-social behavior. He testified that he was aware of the abuse and deprived childhood Defendant had suffered from birth to age 5, but Defendant never told him of the Scarpo abuse. Dr. Afield stated that his testimony to the jury was emphatic that Defendant's disturbed behavior and anti-social traits were caused by the years of abuse and were beyond his control. When asked if he had known about the years of the Scarpo abuse, whether it would have changed or modified his opinion or testimony at trial, Dr. Afield replied that he did not think so, it would have only served to confirm his opinion.
Mr. Barbas testified that Dr. Afield stated in his trial testimony that Defendant was a sociopath and could not be rehabilitated. Mr. Barbas stated that Dr. Afield explained to him that Defendant's problems were due to Defendant finding out at age thirteen: that Mr. Scarpo was not his real father, his mother was a lesbian and committed suicide, the form of his uncle's death, and his real father was killed in a bar fight, along with all of the abuse that occurred prior to age five.
Dr. Afield testified that when he stated that Defendant could not be rehabilitated, he meant that Defendant did not deserve the death penalty because he was a victim of some bad circumstances that were not his fault.

*70 After reviewing Defendant's Motion, the court files, and the trial and evidentiary hearing transcripts, the Court finds that Dr. Afield, after interviewing and testing Defendant and reviewing all available documentation concerning Defendant's psycho-social history, rendered adequate assistance on Defendant's behalf. Therefore, this ground is denied.
Order Denying Defendant's Third Amended Motion to Vacate Judgments of Conviction and Sentence with Special Request for Leave to Amend at 21-23, State v. Stewart, Nos. 85-4025, 85-4825 (Fla. 13th Cir.Ct. Jun. 25, 1999).

B. Brady Violation
Stewart next argues the trial court erred in denying Stewart's claim that the State failed to provide jail records to his attorney prior to trial in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). To be entitled to relief under Brady, a defendant must satisfy three elements: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Way v. State, 760 So.2d 903, 910 (Fla.2000) (quoting Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). The evidence at the evidentiary hearing supports the trial court's conclusion that Stewart failed to carry his burden as to the second prong of his Brady claim:
On cross-examination, Mr. Brody asked Mr. Skye if the State had ever obtained the Hillsborough County jail records. Mr. Skye stated that since there was no discovery for the penalty phase in 1985 or 1986, his recollection was that the State never obtained, thought about, or cared about those records. When asked if he thought the State had no Brady obligation to provide the jail records to the defense, Mr. Skye stated, "I would say that's true because my understanding of the Brady [sic] is that the state attorney or the prosecutor doesn't have an obligation to go out and seek out exculpatory things [that] are equally available to the defendant."
In view of the fact that the Hillsborough county jail records were equally available to [the] Defendant or anyone who subpoenaed them, the court finds that the State did not suppress or withhold those records.[15]
Accordingly, the trial court was correct to deny Stewart's Brady claim. See Provenzano v. State, 616 So.2d 428, 430 (Fla. 1993) ("There is no Brady violation where the information is equally accessible to the defense and the prosecution, or where the defense either had the information or could have obtained it through the exercise of reasonable diligence.") (citing Hegwood v. State, 575 So.2d 170, 172 (Fla.1991), and James v. State, 453 So.2d 786, 790 (Fla. 1984)).

C. Shackling
In Stewart's remaining claim, he argues that the trial court erred in summarily denying his claim that his equal protection and due process rights were violated by his being shackled in front of the jury. On Stewart's direct appeal we determined that the trial court did not abuse its discretion in refusing to remove Stewart's shackles following a defense objection:

*71 Later, on Stewart's motion for a new trial, the court after hearing argument from both sides, ruled that the shackles were both unobtrusive and necessary. The judge pointed out that Stewart had remained stationary during the trial, thus giving the jury no opportunity to see him walk in shackles, and that the shackles were barely visible under the table. The judge was also aware that Stewart had on a previous occasion slipped off his manacles, and was facing charges of escape and attempted escape. The judge therefore had reason to believe that Stewart was a high risk prisoner who had previously tried to escape and thus presented a security risk. Though we recognize that shackling is an "inherently prejudicial practice," the trial court, in this instance, properly exercised its discretion to ensure the security and safety of the proceeding.
Stewart, 549 So.2d at 174 (citation omitted). Accordingly, the trial court was correct in summarily denying this claim as it was procedurally barred. Medina v. State, 573 So.2d 293, 295 (Fla.1990).

IV. CONCLUSION
Accordingly, we affirm the trial court's denial of Stewart's 3.850 motion.
It is so ordered.
WELLS, C.J., HARDING and LEWIS, JJ., and PADOVANO, Associate Justice, concur.
SHAW, J., concurs in part and dissents in part with an opinion, in which ANSTEAD and PARIENTE, JJ., concur.
QUINCE, J., recused.
SHAW, J., concurring in part and dissenting in part.
I dissent from the majority's rejection of Stewart's claim of ineffective assistance of counsel as it relates to trial counsel's failure to investigate and present evidence of Stewart's brutal childhood abuse at the hands of his stepfather, Bruce Scarpo. Accordingly, I would vacate Stewart's death sentence and remand the case for a new penalty phase proceeding.

PENALTY PHASE EVIDENCE
During Stewart's penalty phase, Scarpo testified vaguely as to Stewart's abuse as an infant and toddler by his natural mother prior to becoming a part of his household. Specifically, Scarpo testified that he married Stewart's mother to prevent the State from removing Stewart from her custody on account of her neglect and mistreatment of him. Following their marriage, Stewart's mother ran off with a young man, taking Stewart with her. According to Scarpo, Stewart's mother would call Scarpo constantly to ask for money and would indicate during those conversations that Stewart had little if anything to eat for days at a time. Stewart's mother finally returned with him when he was four and shortly thereafter abandoned Stewart altogether, leaving him in the care of Scarpo. Scarpo commented that upon his return, Stewart was dirty, disheveled, and noticeably thinner than he was when his mother ran off with him nearly a year earlier.
As to Stewart's childhood with him, Scarpo characterized Stewart as a fairly happy child between the ages of five and thirteen. During this time Scarpo testified that the two enjoyed a good father-son relationship. According to Scarpo, Stewart idolized him. Importantly, Scarpo testified that he did not abuse or mistreat Stewart at any time while he was living with him. Scarpo claimed that Stewart's personality changed at the age of thirteen after he ran away from home upon discovering that Scarpo was not his natural father. At this time Stewart also learned of *72 the circumstances surrounding his mother's suicide and his natural father's death. In sum, Scarpo testified that this new information essentially triggered a change in Stewart's personality leading Stewart to a life of crime.
Stewart's stepmother, Joanne Scarpo, testified similarly, describing Stewart as a "jovial little boy" whose demeanor changed dramatically at the age of thirteen.

THE EVIDENTIARY HEARING
A starkly different portrait of Stewart's childhood with Scarpo was painted by Stewart's stepsisters, Susan Moore and Linda Arnold, during the evidentiary hearing on Stewart's ineffectiveness claims. Moore and Arnold testified that Scarpo physically and emotionally abused them, Stewart, the other children, and their mother, Joanne Scarpo, repeatedly.
Moore testified that from the first day Stewart arrived in the Scarpo household, at the age of four or five, Scarpo would beat Stewart with his fists as though he were a grown man:
A. [H]e beat Kenny as if he were a grown man, as if he were beating somebody up.
Q. With his fists?
A. That's correct.
Q. Could you describe one of the incidents?
A. Um, probably when we were ten or eleven years old, Kenny was ten or eleven we were sitting at the kitchen table one evening. My mother asked Kenny why didn't you take the trash out today and Bruce got upset because the trash wasn't taken out so he started hollering and screaming and yelling at him and then beating him over the kitchen table.
Q. How, in what manner?
A. Slapping him. He grabbed him, you know, pulled him up, grabbed him and started slapping him, you know if he was knocked down he would tell him to get up, be a man, get up and slap him some more. Then he made Kenny sit down in the corner of the kitchen where the trash can usually sat and dumped the trash out of the trash can and made Kenny sit with the trash can on his head while we finished dinner.
Moore also testified that Scarpo would beat Stewart when he would wet his bed and then make him sit on the wet bed for days despite knowing that Stewart's bed wetting was the product of a medical condition. The other children in the house, as well as Stewart's stepmother, were also physically abused. Moore further testified that Scarpo sexually abused her, but did not know if he sexually abused Stewart. Additionally, Moore indicated that Scarpo was a frequent abuser of alcohol.
Nearly identical testimony of unrelenting abuse was obtained through Stewart's other stepsister, Linda Arnold. Stewart's aunt, Lilly Brown, also testified at the evidentiary hearing. She indicated that Stewart's grandmother, Estelle Berryhill, told her that Scarpo brutally beat Stewart.

COUNSEL'S INVESTIGATION
Stewart's defense counsel, Rex Barbas, testified at the evidentiary hearing that he hired an investigator, Sonny Fernandez, to investigate Stewart's case in both the guilt and penalty phases. According to Barbas, Scarpo was his main contact for the names of witnesses relative to the development of mitigating evidence. Investigator Fernandez suffered a heart attack shortly before trial after which his wife, Diane Fernandez, an experienced investigator in her own right, picked up the investigation.
While Barbas did testify at the evidentiary hearing that he personally interviewed *73 Stewart's stepsisters, aunt, and grandparents, he was uncertain about the extent of his own investigation. Indeed, on numerous occasions Barbas indicated that he could not remember if he ever spoke to Linda Arnold.[16] Moreover, Barbas testified that he was wholly unaware of any abuse suffered by Stewart at the hands of Scarpo, notwithstanding the fact that his investigator, Sonny Fernandez, stated that he was aware that Stewart had been abused as a child:
Q. So, during your investigation did you have information that Bruce Scarpo had abused [Stewart]?
A. Yes, sir, its right there [referring to his investigative file].
Fernandez conducted an interview on July 17, 1986, with Joyce Engle, an employee of the Florida Department of Health and Rehabilitative Services from Tampa who testified during Stewart's penalty phase. Engle met Stewart roughly eight or nine months prior to Stewart's trial while visiting a friend in jail and developed an intimate relationship with him during that time. During her interview, Engle advised Fernandez of Scarpo's abuse of Stewart:
Engle: He's [Stewart] told me that he's paid all his life, he really feels it ... he has ... and I do too. His Aunt Lilly said he was very abused as a child.

Fernandez: How was he abused, do you know?
Engle: I questioned her and I said, "physically". And, see Kenny had to straighten me last night and I don't know if he knows what he's talking about or not. She said, Joy, Pete abused him physically and emotionally; she abused him physically and emotionally, and Bruce did. Well he's told me about the beatings Bruce gave him but he said that my Dad was just very strict, and I believe in that. He says my Dad ... see he probably would not say that today because he's so mad ... but when his Dad and him ... when he thought his Dad was really trying to help him, he said my Dad brought us up till you know you do something wrong you get the shit beat out of you. You know you have to be a man. And, Kenny's never reached back to hit his father, but his Father will beat him, you know, knock you in the stomach, knock you down, bruise you and beat you up, and that's the way Bruce handled him, or handled Kenny anyway.

(Emphasis added.) Despite having this information in hand, it appears that neither Fernandez nor Barbas followed up this lead provided by Engle.
There was no indication in Fernandez's investigative file that he contacted Stewart's aunt, Lilly Brown, prior to or immediately after receiving this information from Engle, despite making a notation in his file to do so. As to the absence of any indication in his investigative file that he contacted Brown, Fernandez explained: "If I would have talked to her I would have probably made a note of it, but then I don't know when I had the heart attack." Further, Brown testified that she was never contacted by an investigator following *74 Stewart's arrest and would have been willing to testify about Scarpo's brutal abuse of Stewart.
Moreover, stepsisters Moore and Arnold testified at the evidentiary hearing that although they were interviewed by Fernandez prior to Stewart's penalty phase they were not asked specifically about any abuse by Scarpo. Further, both Moore and Arnold testified that they would have been willing to testify about Stewart's abuse had they been asked.
At the evidentiary hearing, Fernandez did not specifically recall asking Moore and Arnold about abuse by Scarpo, but indicated that he would normally seek such information during the penalty phase and that his notes would reflect any affirmative responses by either of the stepsisters with regards to abuse by Scarpo. The witness information sheets containing Fernandez's notes of his interviews with Moore and Arnold contain no indication that either of them stated that Scarpo abused them or Stewart.
Moore was interviewed by Fernandez on June 17, 1986, a month prior to the interview with Joyce Engle. Nevertheless, there was no indication in Fernandez's investigative file, nor did Fernandez testify at the evidentiary hearing, that he followed up on the abuse issue following the interview with Engle. Moreover, despite conducting an interview with Arnold only three weeks after the interview with Engle, there was nothing in Fernandez's investigative file reflecting that he asked Arnold a specific question about abuse by Scarpo.[17] This apparent failure to pursue the potential evidence of Scarpo's abuse of Stewart through interviews with Moore and Arnold, and the failure to contact and interview Stewart's aunt, Lilly Brown, was deficient. See Rose v. State, 675 So.2d 567, 571 (Fla.1996) (quoting Porter v. Singletary, 14 F.3d 554, 557 (11th Cir.1994) ("An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence.")).
Although in judging Barbas' performance we must be mindful of the fact that Stewart gave Barbas no indication that Scarpo abused him, this is not a case in which the defendant obstructed counsel's efforts at effecting a thorough investigation of potential mitigating evidence. Rather, despite having information in hand indicating that Scarpo's account of Stewart's childhood under his care was at the very least incomplete, Barbas and Fernandez inexplicably failed to pursue that line of investigation. Compare Rutherford v. State, 727 So.2d 216, 225 (Fla. 1998) (affirming trial court's denial of ineffectiveness claims where the defendant refused to help counsel develop mitigation by encouraging his parents not to speak with defense investigators regarding his childhood and hindered defense counsel's investigation of his military background); with State v. Riechmann, 777 So.2d 342, 350 (Fla.2000) (affirming the trial court's determination that defense counsel was deficient where evidence suggested that German defendant did not want defense counsel to go to Germany, but "defense counsel conceded that Riechmann did not instruct him or preclude him from investigating or presenting mitigating evidence," including testimony from individuals living *75 in Germany who knew the defendant).[18]
Turning to the question of prejudice, the majority appears to have adopted the two arguments posited by the State in support of the trial court's finding that Stewart was not prejudiced by counsel's failure to investigate and present the evidence of Scarpo's abuse: (1) the evidence of Scarpo's abuse was cumulative to the evidence introduced during the penalty phase that Stewart was abused and neglected by his natural mother and her boyfriend before he came to live with Scarpo; and (2) Dr. Afield's testimony at the evidentiary hearing that his opinion would not have changed with this new evidence of abuse.
I cannot agree that the evidence of Scarpo's brutal abuse of Stewart would have been cumulative. As discussed earlier, at the penalty phase Scarpo testified that Stewart was neglected by his mother prior to becoming part of his household. Scarpo's account of Stewart's neglect and abuse during this time, however, was scant at best. When Scarpo attempted to go into detail about apparent physical abuse by one of Stewart's mother's boyfriends, the trial court sustained the State's hearsay objection to the testimony:
A. He [Stewart] was born in '67. I married her [Stewart's mother] in '68. He would have been five years old.
Q. What was Kenny like from that point on?
A. It took about six months to get adjusted back to what he was used to. After I would say six, maybe eight months, he got into the realm of things and startedI put him in kindergarten doing well. Mischievous at times. But then he would talk about things, what this man had done to him; made him stand in the corner for five, six hours at the time.
Q. What man?
A. This man she was on the road with.
State: Excuse me, Mr. Scarpo. I object to this self-serving hearsay at this point.
Barbas: Judge, we are stalking [sic] about a child six years old, telling him at the age of six. I don't see how it's self-serving.
State: May we approach the bench?
Court: Well, no you don't have to approach the bench. This is obviously hearsay. It's being offered for the truth of the matter asserted, which makes it hearsay, because it's being offered for background as to mitigation of sentence. It's hearsay. Sustained.
In fact, the most detailed "testimony" regarding Stewart's alleged abuse and neglect prior to the age of five came in the form of a lengthy hypothetical question *76 posed by defense counsel to the defense expert, Dr. Afield:
Doctor, I want you to assume certain facts that has [sic] been brought into evidence or which may be brought into evidence as follows:
That at the age of eighteen months an attempt was made by the State of Florida to remove him [Stewart] from his mother. That she subsequently married in order to prevent that to a man named Bruce Scarpo. They subsequently moved to Miami. There was consequence [sic] fighting with inlaws between Mr. Scarpo and the natural mother's family. That they subsequently moved to Charleston, South Carolina, during which time the natural mother left and took Kenny with her and spent the next two years on the road with at least one man, if not more. That there is some indication he was abused during that period of time by the man she was with.
That there was also an indication that he was not fed regularly. Specifically, an indication that at one point all he had to eat would be a hot dog over a period of three days. That when he returned at the age of five years old, he weighed eight pounds less than when he left a year and half or two years earlier.
That he came back in a very unkempt, dirty manner. That at that time his mother left him and left him with his stepfather by the name of Bruce Scarpo.
In sum, the rather vague and sparse account of Stewart's neglect prior to the age of five pales in comparison to the brutality depicted by Stewart's stepsisters. Most significantly, however, Stewart's penalty phase jury had the impression that Stewart had a happy childhood under Scarpo's watch, enjoying a reprieve from the neglect he endured in his early years. In the face of this dichotomy, the evidence of Stewart's abuse at the hands of Scarpo cannot be dismissed as cumulative.
The majority's remaining contention, that Stewart was not prejudiced by counsel's deficient investigation given Dr. Afield's testimony at the evidentiary hearing that his opinion would not have changed in light of this new evidence of abuse, is similarly unavailing. At Stewart's penalty phase, Dr. Afield, an expert in neuropsychiatry, opined, on the basis of Stewart's alleged abuse and mistreatment prior to the age of five, that Stewart's upbringing was a "textbook case on how to raise a sociopath." During Stewart's evidentiary hearing, Dr. Afield testified that the new information of abuse by Scarpo would have confirmed, not altered, his opinion that Stewart was a sociopath who could not be rehabilitated.
Although this Court has previously relied on similar reasoning to deny claims by petitioners that they were prejudiced by counsel's ineffectiveness in failing to investigate and present additional mitigating evidence, those cases are readily distinguishable.
In Brown v. State, 755 So.2d 616 (Fla. 2000), we denied Brown's claim that counsel was ineffective for failing to call additional family members and friends to testify concerning his abuse as a child and low intelligence where the defense expert at trial testified at the evidentiary hearing that the additional evidence would not have changed his testimony. Importantly, the additional evidence Brown claimed should have been introduced during his penalty phase was introduced, though not as extensively, at the penalty phase. Id. at 637. Further, the trial court in Brown denied Brown's claims by noting, at least in part:
The essence of the Defendant's allegation seems to be that the experts' opinions would have been given greater *77 weight if they had additional records upon which to base their opinions at trial, but the psychologist who testified at the hearing stated that although the additional information might have ben helpful, his opinion was unchanged.
Id. at 635. Although Dr. Afield similarly testified in the instant case that the new evidence of Stewart's childhood abuse would not have changed his opinion, given the sparse and vague evidence on which that original opinion was based, I am unable to conclude that the evidence of Scarpo's abuse of Stewart would not have significantly bolstered Dr. Afield's opinion in the eyes of the jury. The jury may well have discounted much of Dr. Afield's opinion given Scarpo's testimony that Stewart essentially recovered and enjoyed a pleasant childhood under his benevolent watch.[19] That testimony seemingly contradicted Dr. Afield's opinion, based predominantly on Stewart's alleged abuse and mistreatment prior to age five, that Stewart's upbringing was a "textbook case on how to raise a sociopath." In fact, the State emphasized the apparent incongruity between the predominantly pleasant childhood described by Scarpo and Dr. Afield's opinion in characterizing Stewart's childhood as "somewhat troubled" in its penalty phase closing arguments:
He [Stewart] had a rough childhood. So did Mr. LaRue.[[20]] He made something of himself. Is Mr. LaRue to be given credit for what he did with his life after his somewhat troubled childhood? Is anybody who has a somewhat troubled childhood, in which there is a lot of conflict, everybody says he was a nice little boy until he was thirteen. Doctor Afield was sure he was ruined by the time he was five. Well, is anyone who has a troubled childhood and is able to make something of themselves entitled to any credit? Of course, they are. Of course, they are.
And if they are, isn't Kenneth Allen Stewart going to have to take some blame for his own actions? For his own actions? Doctor Afield said he is not insane. He is not really in control of his own destiny, but you didn't hear anything from Doctor Afield or anybody else who said anybody forced him to pull out that gun and shoot two people in the back. He decided to do that. That is what he would rather do, that was what he felt more comfortable doing, than getting a job, I guess. That is what Doctor Afield really told you. He is a *78 sociopath. That's the way he, that is what he feels comfortable doing. He just doesn't accept the idea he can't simply have his own way, what he wants when he wants it.
This Court's decision in Breedlove v. State, 692 So.2d 874 (Fla.1997), wherein we held that the petitioner did not establish prejudice in his ineffectiveness claim where the defense's penalty phase experts testified at the evidentiary hearing that the additional information from family members concerning the petitioner's childhood abuse would not have changed their testimony, is also distinguishable.
Paramount to this Court's finding in Breedlove of no prejudice was the balance of aggravating and mitigating factors:
Even if the trial court had found mitigating circumstances in additional testimony from lay witnesses, the three aggravating factors we have previously affirmed overwhelm whatever mitigation the testimony of Breedlove's friends and family members could provide.... [T]he three aggravating factors set forth in Breedlove's sentencing [prior violent felony convictions, murder in the course of a felony (burglary), and HAC] overwhelm potential mitigating factors presented by witnesses at the 1992 postconviction hearing.
Id. at 878; see also Tompkins v. Dugger, 549 So.2d 1370, 1373 (Fla.1989) (affirming the trial court's finding that petitioner had failed to demonstrate prejudice in his ineffectiveness claims for counsel's alleged failure to introduce additional mitigating evidence consisting of childhood abuse and drug addiction given the weight of the aggravating factors found by the trial court: prior violent felony conviction, murder in the course of a felony (sexual battery), and HAC). The instant case is not similarly aggravated. The trial court only found two aggravating factors: (1) prior violent felony convictions; and (2) murder in the course of a felony (robbery).

CONCLUSION
Given the drastically different picture of Stewart's childhood painted by Stewart's stepsisters I cannot join the majority in holding that there is no reasonable probability that the balance of aggravating and mitigating circumstances would have been different had the evidence of Scarpo's brutal abuse of Stewart been presented to the jury. See Rose, 675 So.2d at 571. I would reverse the lower court's denial of Stewart's ineffectiveness claim, vacate Stewart's death sentence, and remand the case for a new penalty phase proceeding.
ANSTEAD and PARIENTE, JJ., concur.
NOTES
[1] The State's case focused on the testimony of Acosta, the eyewitness and surviving victim, describing the events surrounding Harris's murder and on Smith, who testified that Stewart had admitted the shootings and provided details about the offense. The State also presented testimony about a telephone conversation Stewart had with his grandmother, overheard by a police detective, wherein Stewart admitted that he shot the victims in order to rob them. Finally, the State offered forensic testimony that the bullets recovered from the scene matched a gun and ammunition found in Stewart's possession at the time of his arrest. Stewart did not present any evidence in defense; instead, Stewart's defense argued that the shooting was accidental based primarily on Acosta's testimony that Stewart struck her and fired three shots from the back seat immediately after she stepped on the car's accelerator in an effort to throw Stewart off balance.
[2] This Court reversed Stewart's life sentence for the armed robbery conviction and remanded the case for imposition of a guidelines sentence. See Stewart, 588 So.2d at 974.
[3] In his motion, Stewart incorrectly numbered his claims as though he had raised twenty-six claims. Consistent with the trial court's disposition of these claims, Stewart's claims are numbered as they appeared in his 3.850 motion. Stewart's twenty-four claims were: (1) public records were withheld; (2) he was innocent of first-degree murder and was denied an adversarial testing; (3) counsel was ineffective at sentencing phase; (4) counsel was ineffective during voir dire; (5) the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (6) counsel was ineffective before trial and during the guilt phase; (7) the competency hearing was unreliable; (8) counsel was ineffective in failing to properly prepare mental health experts to make their competency evaluations; (9) Stewart was incompetent to proceed at all material stages; (10) he was provided inadequate mental health assistance due to inadequate time and documentation; (11) the penalty phase jury instructions diminished the jury's sense of responsibility in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); (12) the penalty phase jury instructions shifted the burden to the defense to prove that death sentence was not the appropriate punishment; (13) the finding that the murder was committed in the course of a felony constituted an unconstitutional automatic aggravating factor; (14) the statute providing aggravating circumstances is facially vague and overbroad; (17)[sic] the prosecutor made improper argument on aggravating circumstances in violation of Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), defense counsel was ineffective in not objecting to same; (18)[sic] the trial court erroneously refused to find mitigation based on evidence presented and excluded hearsay evidence in the penalty phase; (19)[sic] the mental health evaluation was inadequate as to mitigating factors involving voluntary intoxication; (20)[sic] the prosecutor engaged in misconduct and defense counsel was ineffective for failing to object; (21)[sic] Stewart was denied a proper direct appeal due to an incomplete record and counsel was ineffective in failing to ensure the preparation of the complete record; (22)[sic] the trial was unreliable due to ineffective assistance of counsel and Brady violations and because of newly discovered evidence; (23)[sic] there is newly discovered evidence; (24)[sic] Stewart was improperly shackled during the guilt and penalty phases of the trial; (25)[sic] the death penalty statute is unconstitutional; and (26)[sic] Stewart is entitled to relief due to cumulative error.
[4] The trial court summarily denied claims (7), (9), (11), (12), (13), (14), (17), (18), (20), (24), (25), and (26) as procedurally barred. Claims (2), (4), (8), (22), and (23) were summarily denied as insufficiently pled. The trial court denied claim (1) because, at the hearing held on April 2, 1997, pursuant to Huff v. State, 622 So.2d 982 (Fla.1993), the State relayed that all public records had been provided and Stewart made no allegations to the contrary. Moreover, the trial court noted that both parties agreed that all public records requests had been complied with up until the point of the trial court's denial of this claim. The trial court also summarily denied claim (19) as an abbreviated restatement of claim (10), without any specific factual support. Claim (21), alleging ineffective assistance of trial and appellate counsel in failing to ensure a complete record on appeal, was summarily denied as procedurally barred with respect to the claim of ineffective assistance of trial counsel, and as inappropriate for treatment in a 3.850 motion with regards to the claim of ineffective assistance of appellate counsel.
[5] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[6] Claims (3), (6), (7), and (9) are procedurally barred because they should have been raised on direct appeal. See Teffeteller v. Dugger, 734 So.2d 1009, 1026 (Fla.1999); Ragsdale v. State, 720 So.2d 203 (Fla.1998). Claims (4) and (5) are also procedurally barred because they were previously raised in Stewart's direct appeal and found to be without merit. See Garcia v. State, 622 So.2d 1325 (Fla. 1993). Finally, Stewart asserts in claim (10) that he was denied a fundamentally fair trial due to the cumulative effect of the errors which occurred below. Because we determine that no errors occurred, we necessarily must conclude that this claim is also without merit. See, e.g., Downs v. State, 740 So.2d 506, 509 (Fla.1999) (concluding that where allegations of individual error do not warrant relief, a cumulative error argument based thereon is without merit).
[7] Stewart's claim of ineffectiveness for counsel's failure to request a jury instruction on voluntary intoxication is similarly without merit. At the evidentiary hearing, Barbas testified that he did not request the instruction because, in addition to the reasons detailed above, he did not believe he was entitled to an instruction on the evidence produced at trial. Trial counsel's conclusion in this regard was reasonable.

Furthermore, Barbas' decision to focus on mitigation portraying Stewart as a victim of circumstances beyond his control rather than emphasizing his drinking and chronic substance abuse was entirely reasonable, and the record contradicts Stewart's assertion that Stewart's mental health expert was not aware of this potential mitigating evidence. As such, Stewart's argument that counsel was ineffective for failing to present additional penalty phase evidence about Stewart's intoxication on the night of the murder is also without merit.
[8] Barbas noted the standard practice in Hillsborough County in 1986 was to only appoint one defense attorney for capital cases. Although he did not have co-counsel, Barbas testified that he had the assistance of other experienced attorneys in his office as well as the assistance of the investigative firm he hired to pursue penalty phase issues. It should also be noted that Barbas was not without capital trial experience. Barbas prosecuted capital cases while working at the State Attorney's Office from 1975 to 1979, and had defended ten capital defendants prior to Stewart. Stewart is the only one of Barbas' capital defendants to have ever received the death penalty.
[9] It should also be noted that, at the time of the evidentiary hearing, Linda Arnold, one of Stewart's stepsisters, never told anyone (including her husband) about the alleged abuse at the hands of Scarpo. In addition, Fernandez testified that he asked both stepsisters about coming to testify at the penalty phase, but both declined to do so. Moreover, at the time of the evidentiary hearing, Scarpo and his wife were no longer alive and, therefore, unable to rebut any of the stepdaughter's claims of abuse.
[10] During the evidentiary hearing, Dr. Afield confirmed that his new knowledge about possible abuse by Scarpo would not "in any manner" change or modify his opinion or any of his testimony from trial. Also, given the similarity between the evidence presented at trial (abuse of Stewart by his mother) and the evidence of abuse presented at the evidentiary hearing, the trial court's finding that the new evidence of abuse would not make a difference is reasonable and, therefore, should not be disturbed on appeal.
[11] See State v. Riechmann, 777 So.2d 342, 347-51 (Fla.2000) (finding representation deficient where counsel conducted "no investigation and presented no evidence of mitigation"); Rose v. State, 675 So.2d 567, 571-73 (Fla.1996) (finding representation deficient where "counsel made practically no investigation of mitigation"); Heiney v. State, 620 So.2d 171, 173-74 (Fla.1993) (remanding for new sentencing hearing because "counsel did not attempt to develop a case in mitigation... nor did he make any arguments on the defendant's behalf to the trial judge"); Phillips v. State, 608 So.2d 778, 782-83 (Fla.1992) (remanding for new sentencing proceeding where trial counsel did "virtually no preparation for the penalty phase"); Mitchell v. State, 595 So.2d 938, 941 (Fla.1992) (holding that penalty phase representation was ineffective where defense counsel presented no evidence of mitigation); State v. Lara, 581 So.2d 1288, 1289 (Fla.1991) (finding representation deficient where counsel "virtually ignored" preparation for penalty phase); Stevens v. State, 552 So.2d 1082, 1087-88 (Fla.1989) (remanding for new sentencing where trial counsel never interviewed defendant regarding his background and "made no attempt to offer evidence of a single mitigating factor").
[12] Barbas apparently provided sufficient evidence for the trial court to at least find the existence of three mitigating circumstances in favor of Stewart: (1) murder committed while under the influence of extreme mental or emotional disturbance; (2) substantially impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law; and (3) age at the time of the offense (twenty-one). The trial court also found "catch-all" mitigation related to "some sort of trauma" Stewart suffered at age 13, but gave it no weight.
[13] This case is analogous to Asay v. State, 769 So.2d 974, 987-88 (Fla.2000), where this Court rejected the defendant's argument that his counsel rendered deficient performance for failing to investigate and present certain nonstatutory mitigation, i.e., abusive and poverty-stricken childhood and history of alcohol and drug abuse. In Asay, collateral counsel presented evidence of a childhood where the defendant "suffered severe beatings at the hands of his parents, was deprived of food, and at age twelve provided sexual favors to men in exchange for money." Asay, 769 So.2d at 987. During the evidentiary hearing, penalty phase counsel testified that "he interviewed the defendant and his mother concerning the existence of mitigating circumstances and his investigator contacted additional potential witnesses regarding mitigation," but said he was not aware of the extent of abuse alleged in the 3.850 motion. Id. Nonetheless, this Court affirmed the trial court's finding that the penalty phase counsel conducted a reasonable investigation, "especially when coupled with penalty phase counsel's testimony as to the difficulty in obtaining information from Asay's mother." See id. at 988.
[14] Dr. Afield's testimony is borne out by the record of his penalty phase testimony:

A.... We then have a boy who runs away, winds up in a variety of institutions, essentially, gets in [sic] postgraduate course in how to be a psychopath. Tries to kill himself a few times. Winds up in the hospital.
Q. Has he, in fact, attempted suicide since all this occurred?
A. Yes, it's my understanding he has. I think he will, again, at some point.
[15] Furthermore, both Barbas and Dr. Afield testified that they were at the very least aware of the content of those records, namely, that the defendant attempted to commit suicide in jail on several occasions and was subsequently hospitalized.
[16] Barbas was only certain that he interviewed everybody who testified at the penalty phase:

I relied on Mr. Scarpo to give me names of witnesses. I personally interviewed all of the people who testified and I believe Mrs. Fernandez also interviewed a number of people who testified during the penalty phase. I was, it was always my custom to interview every single person who testified. I never allowed the investigator to do the interviews by themselves for trial.
Neither Linda Arnold nor Stewart's aunt, Lilly Brown, testified during Stewart's penalty phase.
[17] Moore was deposed by the defense, but it is unclear when her deposition was taken. That deposition was read into evidence during Stewart's penalty phase. Her testimony focused on Stewart's change in demeanor after learning that Scarpo was not his natural father. At no time during the deposition was Moore questioned about the existence of any childhood abuse of Stewart.
[18] The majority claims that this case is analogous to Asay v. State, 769 So.2d 974 (Fla. 2000), where we rejected Asay's claim that counsel was deficient for failing to investigate and present mitigating evidence which included evidence of Asay's abusive and poverty-stricken childhood. In Asay we concluded that counsel's investigation was reasonable based, at least partly, on the testimony of penalty phase counsel as to the difficulty in obtaining information from Asay's mother. Id. at 988. However, although Asay's penalty phase counsel was not aware of the extent of the abuse alleged in the postconviction motion, counsel appeared to make a strategic decision to forego the presentation of such evidence as he was aware "that Asay's `childhood had not been a great one' and that there had been problems with Asay's mother leaving her children alone for lengths of time." Id. at 987-88. Here Barbas was wholly unaware of any abuse by Scarpo despite the presence of that information in investigator Fernandez's file. Moreover, at least with regards to Stewart's aunt there is no claim that Barbas' investigation was thwarted by an uncooperative witness. Stewart's aunt was willing to testify, but was never contacted.
[19] The trial judge in his sentencing order did not find Dr. Afield's testimony compelling and, as indicated by the following reference, the court was of the impression that the first thirteen years of Stewart's life were unremarkable:

The Court has heard the testimony of witnesses called by the Defendant as to the fact that the Defendant suffered some form of trauma at approximately the age of thirteen (13) years, when during a relatively short period of time, his mother committed suicide, two (2) aunts were killed in a vehicular accident, and discovered that the man he thought to be his natural father was, in fact, his step-father; that he was given information that his step-father was instrumental in some way in the death of his natural father. However, in tracing the Defendant's life, in the opinion of this Court, the Defendant was able to cope with these various situations and found methods of providing ways to house, clothe, and feed himself, and in the Court's opinion, deliberately chose a life that led him eventually to the commission of the crime for which he is to be sentenced.
[20] Lash LaRue, a friend of the family, testified concerning the change in Stewart's demeanor at the age of thirteen. During cross-examination by the State, LaRue indicated that he also lost his father at an early age and vaguely stated that he had a "rough childhood."