[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 31,2007
THOMAS K. KAHN
CLERK

_____

No. 06-11684

_____

D. C. Docket No. 05-01022-CV-EAK-TGW

KENNETH ALLEN STEWART,

Petitioner-Appellant,

versus

SECRETARY, DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(January 31, 2007)**

Before DUBINA, HULL and MARCUS, Circuit Judges.

HULL, Circuit Judge:

In this capital case, Kenneth Stewart appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. The only issues on which Stewart was granted a certificate of appealability are whether Stewart's trial counsel was ineffective in failing to: (1) provide the mental health expert witness with all available information to identify possible mitigating circumstances; and (2) adequately investigate and prepare mitigating evidence for the penalty phase. After review and oral argument, we affirm.

## I. BACKGROUND

### A. Guilt Phase

In August 1986, a jury in the Circuit Court of Hillsborough County, Florida convicted Stewart of first-degree felony murder, attempted second-degree murder with a firearm, armed robbery, and arson. On direct appeal, the Florida Supreme Court affirmed the convictions and described how Stewart murdered Mark Harris and shot Michele Acosta after they picked Stewart up from hitchhiking, as follows:

> [O]n April [14,] 1985, Michele Acosta and Mark Harris picked up appellant, Kenneth Stewart, while he was hitchhiking. When Acosta stopped to drop Stewart off, he struck her on the head with the butt of a gun and fired three shots, hitting Acosta in the shoulder and Harris in the spine. Stewart then forced Acosta and Harris from the car before driving off and picking up a friend, Terry Smith. The two removed items from the car's trunk[,] and Stewart burned the car after telling Smith that the car belonged to a woman and man whom he had shot. Acosta recovered from her injuries; Harris later died.

2

Stewart v. State, 549 So. 2d 171, 172 (Fla. 1989).

Indeed, at trial, the state presented overwhelming evidence of Stewart's guilt. Among the many witnesses, Acosta described Stewart's actions as the eyewitness and surviving victim. After the murder, Stewart picked up his friend Terry Smith in Acosta's car. Smith testified that Stewart had admitted the shootings to him and burned the car to eliminate fingerprints.[1] Detective George Lease testified that he overheard Stewart admit the shootings during a telephone conversation with Stewart's grandmother.[2]

Forensic evidence linked the bullets recovered from the crime scene with the gun and ammunition found in Stewart's possession at his arrest. A search of Stewart's apartment yielded the items he and Smith had taken from Acosta's car.

---

[1] In exchange for Terry Smith's cooperation in testifying against Stewart, the state reduced pending attempted murder charges against Smith to two counts of aggravated battery. Rex Barbas, Stewart's trial counsel, questioned Smith about this plea agreement during his cross-examination at trial, and Smith testified accurately about the deal.

[2] As recounted by the Florida Supreme Court:
When shown a photopack display of suspects, Harris, who had not yet expired, and Acosta identified Stewart as the assailant. Acosta also identified Stewart in person at a preliminary hearing. While in jail, Stewart telephoned his grandparents. Detective [George] Lease, who was visiting the grandparents, obtained their permission to secretly listen in on an extension. Via pretrial motions, Stewart sought to suppress the identifications made by Acosta and Harris, and the telephone conversation overheard by Lease. The court excluded the identification made by Harris, but ruled admissible both of Acosta's identifications and the telephone conversation.
Stewart v. State, 549 So. 2d at 172.

3

Given the overwhelming evidence, Stewart's trial counsel conceded that Stewart shot Harris and Acosta and presented no evidence in Stewart's defense.[3] Stewart v. State, 549 So. 2d at 172. Instead, trial counsel argued that Acosta's car lunged forward to throw Stewart off-balance, which caused Stewart's gun to discharge accidentally. Accordingly, trial counsel argued that Stewart was guilty of aggravated battery and manslaughter or, at the most, second-degree murder,[4] but not first-degree murder. After deliberation, the jury unanimously found Stewart guilty of the first-degree murder of Harris, the attempted murder of Acosta, armed robbery, and arson.

**B. Penalty Phase**

During the penalty phase, the state presented evidence of Stewart's three prior violent felony convictions. Specifically, the state called witnesses Anne Badstein, a court clerk for the Circuit Court of Hillsborough County, and Anthony Morone, a deputy sheriff of the Hillsborough County Sheriff's Office. Badstein and Morone verified court records showing Stewart's prior convictions for

---

[3]At the state 3.850 evidentiary hearing, trial counsel stated that he did not call Stewart to testify at trial because during a client interview prior to trial, Stewart admitted that he planned to shoot and rob Harris and Acosta. Trial counsel thus believed that Stewart's testimony "would have given him premeditated murder[,] which in my mind was worse than felony murder."

[4]Under Florida law, these lesser-included offenses were not punishable by a death sentence. See Fla. Stat. § 775.082 (reserving the death penalty only for capital felony convictions).

attempted first-degree murder, aggravated assault, and attempted armed robbery. These verified court records contained only the judgments, which showed that Stewart was convicted of these three crimes on June 9, 1986, and did not reveal any factual circumstances of these crimes.[5] The state introduced these authenticated records into evidence.

As mitigating evidence, Stewart presented the testimony of family members, friends, and a psychiatrist in order to establish evidence of extreme mental disturbance and impaired capacity.

Bruce Scarpo, Stewart's stepfather, described Stewart's violent early childhood with his biological mother and her family. Mr. Scarpo testified that he married Stewart's mother and had raised Stewart from eighteen months old. According to Mr. Scarpo, family members of Stewart's mother frequently visited his house and were often drunk and violent. When Stewart was three years old, Stewart's mother abandoned him with Mr. Scarpo, who filed for divorce. Two years later, Mr. Scarpo entered a relationship with another woman, Joanne Scarpo, and continued to raise Stewart with Joanne Scarpo's three children. Mr. Scarpo

---

[5]These convictions involved Stewart's armed robbery of a convenience store on April 19, 1985, where Stewart robbed and shot the convenience store manager, James Harvel, in the head. While these crimes occurred on April 19, 1985 and Stewart was convicted of these crimes on June 9, 1986, Stewart was not sentenced for these crimes until after the death penalty trial in this case.

compared their family life to "The Waltons," denied ever abusing Stewart, and claimed that Stewart was a typical child who blended in with the family.

Mr. Scarpo claimed that Stewart had no major problems until Stewart discovered at age thirteen that Mr. Scarpo was not his biological father. After learning that his mother had committed suicide and his father was killed in a bar fight, Stewart ran away from Scarpo's home to live with his grandparents. Thereafter, Stewart had his first juvenile criminal conviction, and his grandparents returned custody to Mr. Scarpo. At this point, Mr. Scarpo testified that Stewart transformed from being an average student with few discipline problems to an introverted child filled with animosity who repeatedly skipped school and blamed Mr. Scarpo for his father's death.

James Hayward, who hosted Stewart for several months in 1977, testified next for the defense. Hayward stated that when Stewart was thirteen years old, Stewart learned that: (1) his mother had committed suicide; (2) Mr. Scarpo was not his biological father; (3) his biological father was killed in a bar fight; (4) his uncle was murdered in 1968; and (5) his two aunts were killed in a car accident.

Dr. Walter Afield, M.D., a psychiatrist, was Stewart's next witness. Dr. Afield evaluated Stewart twice before preparing his psychiatric report and met with Stewart again the night before the penalty phase testimony. Dr. Afield conducted

6

psychological and neurological testing on Stewart, reviewed Stewart's medical records and other documents, and consulted with other doctors who had examined Stewart.

As a result of his evaluation, Dr. Afield found that Stewart had suffered significant childhood trauma. Dr. Afield noted that the first five years of life are crucial to childhood development and that most personality disorders are firmly established by this age. Dr. Afield stated that Stewart was exposed at an early age to "bad abuse" with his biological mother and opined that this violent upbringing had locked in a tendency toward violence by age five. Specifically, Dr. Afield testified that based on the history of violence and abuse, "[Stewart] has no control over his destiny, in my opinion, when you have gone this far. It's very difficult to control." Accordingly, Dr. Afield determined that Stewart "has been programmed from early on. This is a textbook [case] on how to raise a murderer." Although Dr. Afield noted that Stewart could appreciate the criminality of his conduct and that he did not belong in a mental hospital, he concluded, "[Stewart] does have an impairment in terms of conforming his conduct to the capacity of the law. I don't think he has total control [of] it."

Dr. Afield also testified that Mr. Scarpo provided a reasonable amount of stability, but he expressed doubt that anyone could have altered Stewart's downhill

7

course. Dr. Afield stated that the series of tragic revelations about Stewart's family when Stewart was thirteen was "the final blow" and the "trigger" for Stewart's future violent behavior.

Dr. Afield also noted that Stewart had multiple suicide attempts and had visited his mother's grave with a gun and bottle of whiskey. Dr. Afield testified that these events indicated severe mental disturbance. Dr. Afield concluded that Stewart was suffering from chronic depression and sociopathic disorder and found him incapable of rehabilitation.

Joyce Engle, a rehabilitative services worker who befriended Stewart, was the fourth mitigation witness. Engle stated that Stewart was remorseful about the killing and was suffering from emotional problems because of his parents' deaths.

Lash LaRue, a family friend, then testified about his visits to the Scarpo household when Stewart was a young boy. In LaRue's view, Stewart was a normal boy until he was thirteen or fourteen. Mr. Scarpo told LaRue that Stewart's attitude changed after Stewart learned that Mr. Scarpo was not his biological father.

Stewart next presented the deposition testimony of Susan Medlin, one of his stepsisters. Medlin testified that Stewart had a troubled childhood because he felt out of place in the Scarpo household. According to Medlin, Stewart was grief-

8

stricken when he learned that Mr. Scarpo was not his biological father, and Stewart

afterwards had serious criminal problems.

Joanne Scarpo, Stewart's stepmother,[6] was the final mitigation witness.

Joanne Scarpo said that Stewart was a jovial boy who idolized Mr. Scarpo and

resented the other children. She claimed that after Stewart learned at age thirteen

that Mr. Scarpo was not his biological father, he was a very troubled, brooding boy

who started getting into legal trouble. Joanne Scarpo testified that Stewart showed

remorse for his crime.

Following closing arguments and deliberation, the jury, by a 10 to 2 vote,

recommended that Stewart be sentenced to death.

## C. Sentencing Hearings

After denying Stewart's motion for a new trial, the state trial court held two

sentencing hearings. At the September 30, 1986 hearing, counsel for both parties

presented oral arguments as to Stewart's sentence. Stewart's trial counsel argued

that a death sentence was inappropriate given Dr. Afield's testimony about

Stewart's severe emotional disturbance and substantial impairment in his ability to

conform his conduct to the law. In response, the state contended that the trial court

---

[6]It was later revealed in a post-conviction evidentiary hearing that Bruce Scarpo never married Joanne Scarpo, but Joanne Scarpo raised Stewart as a stepmother in the Scarpo household with her three other children.

should follow the jury's recommendation based on Stewart's prior violent felony convictions. The state also presented the testimony of the victim Harris's father, who described Harris as a caring, compassionate son and asked the trial court to impose a death sentence. The state court declared that sentencing would be imposed at a later hearing.

The state court held the next hearing on October 3, 1986.[7] In sentencing Stewart for the Harris murder, the state court found sufficient evidence of two aggravating factors: (1) Stewart's prior convictions for violent felonies; and (2) the murder was committed while Stewart was engaged in a robbery.

The state trial court also found three statutory mitigating factors and a "catch-all" mitigating factor. First, the state court determined that Stewart was under the influence of extreme mental or emotional disturbance when he committed the murder. The state court found that the medical evidence indicated

_____

[7]At the October 3, 1986 hearing, the state court sentenced Stewart not only for the Harris murder in this case, but also for other crimes. In September 1986, Stewart pled guilty to: (1) escaping from county jail in June 1984 while serving a sentence for petty theft and obstruction of justice; (2) attempted escape from county jail in August 1985, following his arrest for the Harris murder; and (3) a probation violation. The court imposed concurrent thirty-year terms for the escape and attempted escape convictions and a consecutive five-year term for the probation violation.
      The state trial court also sentenced Stewart for his June 1986 convictions for the attempted first-degree murder of James Harvel with a firearm, aggravated assault, and possession of a firearm during commission of a felony. The state presented the testimony of Harvel, the convenience store manager who was robbed and shot in the head by Stewart on April 19, 1985. See supra note 5. The state trial court sentenced Stewart to concurrent terms of twenty-two years' imprisonment for the attempted murder conviction and statutory maximum sentences for the possession of a firearm and aggravated assault convictions.

extreme disturbance, but it concluded that Stewart was in "sufficient control of his faculties" when he decided to shoot Harris and Acosta. Accordingly, the state court gave this mitigating factor only "slight weight."

Second, the state trial court found that Stewart had diminished capacity to appreciate the criminality of his conduct. Based on the medical evidence, the state court accorded "little weight" to this mitigating factor. Third, the state court considered Stewart's age at the time of the murder (twenty-one years old) to be a mitigating factor, but it also gave this factor little weight. Lastly, the state court found that Stewart suffered from childhood trauma at age thirteen, but it concluded that Stewart made the choice of committing crimes with full understanding of the consequences.[8]

The state trial court concluded that the aggravating circumstances "far outweigh[ed]" the mitigating circumstances and imposed a death sentence for the murder conviction, as recommended by the jury. The state court then imposed a life sentence for the armed robbery conviction[9] and consecutive fifteen-year

---

[8]The trial court considered this last mitigating circumstance to be an additional factor "in the defendant's background that would mitigate against the imposition of the death penalty," i.e., a "catch-all" mitigating factor. See Fla. Stat. § 921.141(6).

[9]The state prosecutor asked the trial court for a life sentence, an upward departure from the guidelines sentence, for the armed robbery of Acosta. Stewart's trial counsel protested the sentencing enhancement, arguing that Stewart showed mercy by leaving his victims after dragging them out of Acosta's car instead of shooting Acosta and Harris again.

11

sentences for the attempted murder of Acosta and arson convictions.

At the same hearing, the state trial court also imposed a second death sentence based on Stewart's first-degree murder conviction for the December 6, 1984 death of Ruben Diaz. Stewart's conviction for the Diaz murder followed his Harris murder conviction, so the Diaz murder conviction was not considered as an aggravating factor in the Harris trial.[10]

## D. Direct Appeals

On direct appeal, Stewart raised nine assignments of error, including that the state trial court failed to prepare written findings to support the death sentence for the Harris murder conviction and the guidelines departure of a life sentence for the armed robbery conviction. The Florida Supreme Court affirmed the convictions, but it remanded for entry of written findings to support the death sentence and resentencing on the armed robbery conviction. Stewart v. State, 549 So. 2d at 177. The United States Supreme Court denied Stewart's petition for certiorari. Stewart v. Florida, 497 U.S. 1032, 110 S. Ct. 3294 (1990).

On remand, the state trial court entered a written sentence consistent with its prior oral findings in support of the death sentence. In particular, the state court

---

[10]The Harris murder conviction was introduced as an aggravating circumstance in the penalty phase of the Diaz trial. See Stewart v. State, 558 So. 2d 416, 418-19 (Fla. 1990) (detailing the Diaz murder and trial).

found two aggravating circumstances: (1) Stewart's prior convictions for violent felonies; and (2) the murder was committed during the course of a robbery. The state trial court noted its findings of mitigating circumstances of extreme disturbance, impaired capacity, age, and childhood trauma. The state trial court accorded the mitigating factors only slight weight and concluded that the aggravating circumstances far outweighed the mitigating circumstances.[11]

Stewart timely appealed his resentencing, raising six issues. In relevant part, Stewart contended that the state trial court failed to give proper weight to the non-statutory mitigating circumstance of his abused childhood before age five. In affirming the death sentence, the Florida Supreme Court concluded that although the sentencing order did not "mention every incident of abuse that Stewart suffered, we are convinced that it substantially covers his traumatic childhood and find no error." Stewart v. State, 588 So. 2d 972, 974 (Fla. 1991). The United States Supreme Court again denied Stewart's petition for certiorari. Stewart v. Florida, 503 U.S. 976, 112 S. Ct. 1599 (1992).

## II. STATE 3.850 PROCEEDINGS

**A. 3.850 Motion and Hearing**

---

[11]The state court also reimposed the life sentence for the robbery conviction and provided written reasons in support. The Florida Supreme Court reversed the life sentence again and remanded for imposition of a guidelines sentence on the armed robbery conviction. Stewart v. State, 588 So. 2d 972, 974 (Fla. 1991).

On August 2, 1993, Stewart filed a motion to vacate his conviction and sentence pursuant to Florida Rule of Criminal Procedure 3.850. Stewart subsequently amended this initial 3.850 motion and then filed his third amended motion on September 17, 1996, raising twenty-four claims.

On August 15, 1997, the state 3.850 court denied twenty of Stewart's claims and granted an evidentiary hearing on the other four claims, including a claim of ineffective assistance of counsel during the penalty phase of trial. During the evidentiary hearing conducted in December 1998 and March 1999, Stewart presented five witnesses, and the state presented two witnesses.

**B. Testimony of Stewart's Family Members**

Susan Medlin,[12] one of Stewart's stepsisters, was Stewart's first witness in the state 3.850 proceeding. Medlin testified that she lived with Stewart in the Scarpo household until she was fifteen years old. During this period, Medlin claimed that Mr. Scarpo physically and sexually abused her, and she witnessed Mr. Scarpo regularly beating Stewart and her other siblings. Medlin testified that Mr. Scarpo would punch, slap, and beat Stewart with a belt, and this abuse would leave Stewart with black eyes, bruises, and scrapes. In addition to the physical abuse, Medlin said that Mr. Scarpo humiliated and chastised Stewart publicly because he

---

[12]At the time of the state 3.850 hearing, Susan Medlin was known as Susan Moore.

14

urinated in bed, even though Mr. Scarpo knew that the bed-wetting was the product of a medical condition. Medlin testified that Mr. Scarpo was always intoxicated, and he once held a gun to Joanne Scarpo's head and threatened to kill her.

Despite suffering similar abuse, Medlin testified that she had never been convicted of a crime. Medlin stated that she provided a deposition at the penalty phase and would have testified at trial on Stewart's behalf, but she was not asked to do so. Medlin claimed that she was never asked about Mr. Scarpo's alleged abuse during her penalty-phase deposition or during her phone conversations with a defense investigator prior to trial, and she never volunteered the information. Although Medlin conceded that she could have contacted Stewart's lawyers and informed them of the abuse, she did not do so. When asked why she came forward to testify at the state 3.850 evidentiary hearing, Medlin responded that she was testifying "[t]o hopefully save my brother's life and have his sentence maybe commuted to life in prison."[13]

Stewart next presented the testimony of Linda Arnold, his other stepsister raised in the Scarpo household. Arnold also claimed that Mr. Scarpo was always intoxicated and repeatedly abused her physically, emotionally, and sexually.

_____

[13]"[A]t the time of the [3.850] evidentiary hearing, Scarpo and his wife were no longer alive and, therefore, unable to rebut any of the stepdaughter's claims of abuse." Stewart v. State, 801 So. 2d 59, 67 n.9 (Fla. 2001).

Arnold said that on one occasion Mr. Scarpo held a gun to her head. Arnold stated that Mr. Scarpo was more aggressive in his physical abuse of Stewart, often leaving the boy with black eyes, bruises, and cuts after slapping, punching, and beating Stewart with a belt. According to Arnold, Mr. Scarpo would isolate Stewart alone in his room wearing only underwear for days as punishment for bed-wetting. Arnold stated that Stewart also witnessed Mr. Scarpo abuse Joanne Scarpo.

Arnold also testified that she had never been convicted of a crime despite suffering similar abuse as Stewart. Arnold claimed that she was only contacted by a defense investigator after Stewart's trial had commenced, and she did not mention Mr. Scarpo's abuse during their brief conversation.[14] Arnold admitted that she did not know whether Stewart had discussed the abuse with his attorneys.

Lillian Brown, Stewart's aunt, next testified for the defense. Brown first met Stewart while her brother, Stewart's biological father, had custody of Stewart when the boy was about fifteen months old. Brown characterized Stewart's upbringing during this period as "very abusive" due to repeated whippings. Brown next saw Stewart when he was living with his grandmother at age thirteen, and Stewart's

---

[14]The notes of the defense penalty phase investigator, Arturo "Sonny" Fernandez, indicate that he contacted Arnold on August 6, 1986, several weeks before trial, contrary to her testimony. Mr. Fernandez's interview notes with Arnold and Medlin do not contain any mention of alleged abuse by Mr. Scarpo.

grandmother said that Mr. Scarpo subjected Stewart to "very brutal" treatment. Brown also discussed Stewart's treatment directly with Mr. Scarpo, who admitted that he punched Stewart and put garbage cans on Stewart's head as a form of discipline. Stewart lived with Brown briefly when he was thirteen, and he asked questions about his father's and mother's deaths. Brown claimed that she was never contacted by any investigator or defense attorney, though she would have been willing to testify about the abuse at the penalty phase of trial.

## C. Testimony of Stewart's Trial Defense Team

Stewart also presented the testimony of his trial counsel, Rex Barbas, and penalty phase investigator, Arturo "Sonny" Fernandez. From 1975 to 1979, Barbas worked at the state attorney's office in Florida, where he prosecuted first-degree murder cases, including three death penalty cases. After leaving the state attorney's office, Barbas defended at least ten death penalty cases in private practice, and Stewart was the only client to receive the death penalty. After Stewart's conviction, Barbas became a judge in the Circuit Court of Hillsborough County, Florida.

In preparing Stewart's defense, Barbas hired Mr. Fernandez and his wife, Diane Fernandez, both licensed investigators, to find potential mitigation witnesses and assist in interviewing witnesses. Barbas stated that Mr. and Mrs. Fernandez

17

handled the most first-degree murder investigations in Hillsborough County, Florida. Barbas also relied on Mr. Scarpo as his primary contact to provide names of witnesses due to his role as Stewart's guardian.[15] Barbas also testified that while Stewart did not show emotion when he spoke, Barbas believed that he had a communicative relationship with his client.[16]

Barbas described in great detail his strategy during the penalty phase of trial.[17] Barbas personally interviewed every defense witness who testified during the penalty phase in advance of trial: Mr. Scarpo, Hayward, Dr. Afield, Engle, LaRue, Medlin, and Joanne Scarpo. Based on these interviews, Barbas testified that his penalty phase strategy was to convince the jury that the childhood abuse suffered by Stewart before age five, combined with the series of tragic revelations about his family members at age thirteen, triggered his psychological disorders. Barbas was aware of Stewart's suicide attempts in jail prior to trial. Barbas stated

[15]While Barbas used Mr. Scarpo as his main source for contact information for Stewart's family members, Barbas did not rely heavily on Mr. Scarpo for knowledge about Stewart's background. Barbas conceded, however, that Scarpo was the most significant source of information about Stewart's early childhood.

[16]Dr. Afield opined in the competency hearing that Stewart could not cooperate with his trial counsel, but the two other experts at the competency hearing found Stewart cooperative. Barbas testified in the 3.850 proceeding that Stewart was coherent when he spoke, although Stewart did not always understand what Barbas was saying.

[17]Barbas also described his strategy during the guilt phase of trial, but this testimony is not relevant to the ineffective assistance of counsel claims contained in the certificate of appealability. We thus do not review this testimony.

that he may have had Stewart's jail suicide records,[18] but he did not present this information at the penalty phase because he believed that the suicide attempts had no bearing on Stewart's criminal intent.  Barbas noted, however, that Dr. Afield was aware of at least a couple of Stewart's suicide attempts and testified in the penalty phase that these suicide attempts indicated Stewart's severe disturbance.

Barbas testified that he had no awareness of any mistreatment by Mr. Scarpo and that Stewart's stepsisters, grandparents, and aunt never mentioned any abuse by Mr. Scarpo.[19]  This testimony was wholly consistent with the testimony of Stewart's family members, who admitted they never told Barbas about Mr. Scarpo's alleged abuse.  Additionally, Barbas testified that Stewart never told him about Mr. Scarpo's alleged abuse and never contradicted Mr. Scarpo's account of Stewart's happy childhood in the Scarpo household.  When asked, "[b]ased on what [Stewart] told, did you have any . . . reason to believe that Mr. Scarpo had abused Kenny Stewart," Barbas responded, "[j]ust the opposite."

Barbas acknowledged that if he would have had information about Mr.

---

[18]Barbas stated that he recalled seeing jail records and Tampa General Hospital records on suicide attempts, but he could not confirm whether he saw the records before trial. Barbas conceded that he did not know about Stewart's teenage suicide attempt, however.

[19]Although no interview with Arnold was recorded in Barbas's affidavit listing his billing expenses, Barbas claimed that his affidavit reflected only about ninety percent of his work. Barbas remembered speaking to Stewart's stepsisters, grandparents, and aunt, but he did not specifically recall any conversation with Arnold.

Scarpo's abuse of Stewart, he would have presented this information at the penalty phase and considered it important to "buttress and give great sympathy to" Stewart.

Stewart's 3.850 counsel questioned Barbas about an unsigned, undated note found in Barbas's original case file that described Mr. Scarpo's beatings of Stewart. Barbas denied any memory of this note and testified that the handwriting did not match any of his investigators' handwriting. Barbas could not explain the note's presence in his attorney file, but he considered the possibility that Stewart wrote the note, though the note refers to Stewart in the third-person.

Barbas also described the information that he provided to Dr. Afield for his psychiatric evaluation of Stewart. Barbas provided Dr. Afield with information gleaned from his investigators' interviews and from his own interactions with Stewart. In particular, Barbas described the murder incident and informed Dr. Afield that Stewart drank heavily on the day of Harris's murder. Barbas also noted that Dr. Afield was present in the courtroom during Mr. Scarpo's penalty phase testimony and testified that Dr. Afield based his testimony in part on Mr. Scarpo's account. As noted earlier, Dr. Afield also conducted psychological and neurological testing, reviewed Stewart's medical records and other documents, and consulted with other doctors who had examined Stewart. Barbas conceded that if he had information about Mr. Scarpo's alleged abuse, he would have presented this

20

information to Dr. Afield so the psychiatrist could have made a complete assessment of Stewart's childhood, even if the information ultimately would not have changed Dr. Afield's diagnosis.

Stewart next called Mr. Fernandez, Barbas's lead investigator in the penalty phase of Stewart's trial. Mr. Fernandez was a criminal investigator in the Hillsborough County Sheriff's Office for twelve years prior to forming a private investigative firm with his wife in 1980. Mr. Fernandez suffered a massive heart attack just prior to Stewart's trial, which forced him to hand over the remainder of the investigation to his wife.

Mr. Fernandez discussed the extent of his knowledge about Mr. Scarpo's alleged abuse of Stewart. Mr. Fernandez testified that he interviewed Joyce Engle a month before trial, and his interview notes reveal that Engle was told by Brown, Stewart's aunt, about Mr. Scarpo's abuse of Stewart. Mr. Fernandez confirmed that he made a note to call Brown to question her about the alleged abuse, but he could not recall if he contacted Brown.

Mr. Fernandez's investigative file contained the same unsigned, undated note describing Mr. Scarpo's abuse that was present in Barbas's case file. Mr Fernandez did not recall the note or its contents or recognize the handwriting.

Mr. Fernandez also testified that Stewart's stepsisters did not mention Mr.

21

Scarpo's alleged abuse. He conceded that this information would have helped in the penalty phase. Stewart's stepsisters thus talked to both Barbas and Mr. Fernandez prior to trial, and neither stepsister mentioned Mr. Scarpo's abuse to either Barbas or Mr. Fernandez. According to Mr. Fernandez's notes, both of Stewart's stepsisters, Medlin and Arnold, indicated that they did not want to testify in Stewart's trial due to work obligations. As noted earlier, Medlin's deposition was read to the jury in the penalty phase.

### D. Testimony of Mental Health Experts

The state presented the testimony of Dr. Afield, the psychiatrist who examined Stewart before trial and testified in the penalty phase.[20] Dr. Afield stated that he had been certified as an expert witness in psychiatry, neuropsychology, and neurology hundreds of times since 1970.

Dr. Afield was aware of Stewart's suicide attempts and testified about those attempts in the penalty phase as part of his diagnosis. Dr. Afield also noted that his penalty phase testimony described "in great detail" the effect that Stewart's history of childhood abuse had on his mental state. Dr. Afield recalled that his penalty phase testimony concluded that Stewart suffered from antisocial personality

---

[20]The state also called John Skye, a former assistant state attorney who assisted the prosecution of Stewart. Skye's testimony addressed the state's alleged suppression of Stewart's jail records and the state's plea agreement with Smith. His testimony is thus irrelevant to the particular ineffective assistance of counsel claims contained in the certificate of appealability.

disorder triggered by his childhood abuse and revelations about dead family members at age thirteen. Dr. Afield also noted that his penalty phase testimony mentioned Stewart's substance abuse.[21] Based on the neurological testing conducted on Stewart, Dr. Afield found that Stewart had average to above average intelligence and no organic brain damage or psychosis.

Dr. Afield testified that Stewart never told him about Mr. Scarpo's alleged abuse during their three meetings, and Barbas never informed him about any mistreatment by Mr. Scarpo. Dr. Afield conducted no independent investigation aside from his testing and interviews with Stewart, and he was unaware of any abuse by Mr. Scarpo.[22] Despite this lack of knowledge, Dr. Afield concluded that information about Mr. Scarpo's mistreatment would not have modified his opinion in any manner, stating, "I said [Stewart] had been badly abused. [That] [t]here was more history of abuse . . . from Mr. Scarpo wouldn't have made any difference. We still had the same end product[:] a badly abused unfortunate soul."

------

[21]Specifically, Dr. Afield testified in the penalty phase that Stewart visited his mother's grave with a gun and bottle of whiskey. Furthermore, Dr. Afield testified, in the penalty phase and at the 3.850 hearing, that he consulted the August 1986 competency evaluation prepared by Gerald Mussenden, Ph.D., a clinical psychologist, prior to testifying in Stewart's penalty phase. This competency evaluation described Stewart's alcohol and drug abuse in detail, reporting that Stewart could not control his intake of alcohol or illegal drugs and describing his daily consumption of alcohol and cocaine.

[22]In addition, Dr. Afield noted that neither of the two clinical psychologist reports issued at the competency hearing mentioned any abuse by Mr. Scarpo.

In order to critique Dr. Afield's analysis, Stewart's 3.850 counsel presented the deposition testimony of Dr. Faye Sultan, Ph.D., a clinical psychologist. After Stewart's conviction, Dr. Sultan interviewed and tested Stewart on three occasions. Dr. Sultan also reviewed Stewart's jail records and competency evaluations, read penalty phase trial transcripts, and interviewed Stewart's stepsisters. Additionally, Dr. Sultan reviewed Stewart's juvenile court records from the South Carolina Department of Youth Services, which mentioned a suicide attempt at age sixteen and drug and alcohol abuse.

Based on this evaluation, Dr. Sultan concluded that Stewart suffered from depression, antisocial personality disorder, and other mental illnesses. Dr. Sultan agreed with Dr. Afield's diagnosis that Stewart suffered from extreme disturbance and that Stewart's ability to conform his conduct to the law was substantially impaired at the time he murdered Harris. Dr. Sultan also agreed with Dr. Afield's conclusion that Stewart had average intelligence and no organic brain damage. In reviewing Dr. Afield's penalty phase testimony, Dr. Sultan believed that Dr. Afield was missing significant information that would have made his assessment more accurate. Dr. Sultan also refuted Dr. Afield's penalty phase testimony that Stewart was "programmed" to be a killer at a young age, claiming that no mental health expert could determine a person's destiny at age five.

24

**E. 3.850 Rulings**

Following the evidentiary hearing, the state 3.850 court denied Stewart relief on his remaining four claims. In response to Stewart's claim that Barbas failed to adequately investigate and prepare mitigating evidence, the state 3.850 court found that Barbas consulted with other experienced attorneys at his firm during trial preparation and employed experienced mitigation investigators. The state 3.850 court determined that Stewart never contradicted Mr. Scarpo's account of Stewart's happy home life after age five. Although the 3.850 court recognized that Stewart's stepsisters and aunt presented additional mitigating evidence of Mr. Scarpo's alleged abuse, it made no finding as to the performance by Barbas. Instead, the 3.850 court simply determined that Stewart failed to show a reasonable probability that the trial outcome would have been different had this mitigating evidence been presented, and it denied Stewart's ineffective assistance of counsel claims.

The state 3.850 court also rejected Stewart's claim that Barbas failed to prepare Dr. Afield properly as Stewart's mental health expert. The 3.850 court restated Dr. Afield's testimony that he was aware of Stewart's multiple suicide attempts, depression, antisocial behavior, and alcohol and drug abuse. The 3.850 court noted Dr. Afield's testimony at the 3.850 hearing that he knew about the

25

abuse Stewart had suffered before age five, but Stewart never informed Dr. Afield about any abuse inflicted by Mr. Scarpo. The 3.850 court also pointed to Dr. Afield's testimony that knowledge of Mr. Scarpo's alleged abuse would not have changed his opinion or testimony at trial. Based on Dr. Afield's preparation and his "emphatic" jury testimony that Stewart had "no control over his destiny" due to years of abuse, the 3.850 court found that Dr. Afield's mental health assistance was adequate.

Stewart timely appealed the state court's denial of his 3.850 motion. Stewart's 3.850 appeal raised ten issues, and the Florida Supreme Court dismissed seven of these claims as procedurally barred or clearly without merit. Stewart v. State, 801 So. 2d 59, 64 & n.6 (Fla. 2001). In the remaining issues, Stewart argued, inter alia, that trial counsel Barbas rendered ineffective assistance of counsel in failing to: (1) investigate and present evidence of Mr. Scarpo's abuse; (2) obtain Stewart's jail records; and (3) adequately prepare Stewart's mental health expert, Dr. Afield.

The Florida Supreme Court denied Stewart's 3.850 appeal on all grounds on September 20, 2001. Id. at 71. The Court first found that Barbas's efforts to investigate mitigating circumstances were "nothing short of reasonable." Id. at 66. The Court noted that Barbas hired two investigators and echoed the 3.850 court's

26

finding that these investigators were "very experienced in researching and investigating mitigation issues for capital cases." Id. at 67 (internal quotation marks omitted). The Florida Supreme Court observed that Stewart's stepsisters never mentioned any abuse by Mr. Scarpo to either Barbas or Mr. Fernandez prior to Stewart's penalty phase hearing and stated that one of the stepsisters, Arnold, had never mentioned the alleged abuse to anyone at the time of trial. Id. at 67 & n.9.

Moreover, the Florida Supreme Court noted that Stewart never told Barbas or Dr. Afield about any alleged abuse by Mr. Scarpo and never contradicted Mr. Scarpo's description of Stewart's happy childhood in the Scarpo household. Id. at 67. Accordingly, the Florida Supreme Court determined that "by failing to communicate to defense counsel (or the defense psychiatrist) regarding any instances of childhood abuse, Stewart may not now complain that trial counsel's failure to pursue such mitigation was unreasonable." Id.

The Florida Supreme Court also rejected Stewart's claim that Barbas was ineffective by failing to present evidence of Stewart's chronic substance abuse. Id. at 66 n.7. The Court determined that both Barbas and Dr. Afield were aware of the alcohol and drug abuse, but it found Barbas's decision to focus on portraying Stewart as a victim of mistreatment instead of Stewart's substance abuse "entirely

27

reasonable." Id.  The Florida Supreme Court concluded that Barbas "conducted a reasonable investigation, presented appropriate penalty phase evidence, and forcefully argued for the jury to recommend sparing Stewart's life." Id. at 68.

In response to Stewart's claim that Barbas failed to prepare Dr. Afield adequately, the Florida Supreme Court adopted the 3.850 court's reasoning denying that claim.  The Florida Supreme Court quoted the 3.850 court's conclusion that "after interviewing and testing [Stewart] and reviewing all available documentation concerning Defendant's psycho-social history, [Dr. Afield] rendered adequate assistance on Defendant's behalf." Id. at 70. Furthermore, the Florida Supreme Court noted that new evidence about Mr. Scarpo's alleged abuse would not have modified Dr. Afield's testimony in the penalty phase of trial.  The Court stressed that "given the similarity between the evidence presented at trial (abuse of Stewart by his [biological] mother) and the evidence of abuse [by Mr. Scarpo] presented at the evidentiary hearing, the [3.850] court's finding that the new evidence of abuse would not make a difference is reasonable." Id. at 67 n.10.  The Florida Supreme Court affirmed the denial of Stewart's ineffective assistance of counsel claims and his 3.850 motion on all remaining grounds.[23] Id. at 71.

_____

[23]The Florida Supreme Court also determined that Barbas was aware of Stewart's jail records that detailed Stewart's suicide attempts, and it rejected Stewart's claim that Barbas was ineffective by failing to obtain his jail records as mitigating evidence. Id. at 68.

28

**F. State Habeas Proceedings**

On January 9, 2003, Stewart filed a petition for a writ of habeas corpus in the Florida Supreme Court. Stewart's state habeas petition raised three claims: (1) Florida's death penalty statute was unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428 (2002); (2) his appellate counsel was ineffective in failing to raise on direct appeal four issues relating to trial counsel's ineffectiveness at trial; and (3) his appellate counsel was ineffective in failing to challenge trial counsel's concession of Stewart's guilt.

On May 13, 2004, the Florida Supreme Court denied Stewart's habeas petition.[24] Stewart v. Crosby, 880 So. 2d 529, 532 (Fla. 2004). The Florida Supreme Court rejected Stewart's first claim, noting that it had previously upheld Florida's capital sentencing scheme and that Stewart's "prior violent felony aggravator alone satisfies the mandates of the United States Constitution." Id. at 531.

The Florida Supreme Court then analyzed the four issues in Stewart's second claim. The Court found that the first two subclaims, trial counsel's ineffectiveness with respect to mitigating evidence and a possible voluntary

---

[24]Stewart also filed a successive petition for a writ of habeas corpus in the Florida Supreme Court on June 21, 2004, claiming that his conviction violated the Confrontation Clause under Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004). The Florida Supreme Court summarily denied this petition. See Stewart v. Crosby, No. 04-1241 (Fla. Mar. 18, 2005).

intoxication defense, were procedurally barred because Stewart raised these claims in his 3.850 motion.  Id.  The Florida Supreme Court dismissed Stewart's third subclaim, which challenged the reliability of the competency hearing, as insufficiently pled because there were no factual grounds supporting the claim.  Id.  The Court found Stewart's fourth subclaim–arguing that appellate counsel failed to contend that Stewart was incompetent to proceed at all stages of trial–meritless because the trial record provided no evidence of incompetence.  Id.

Finally, the Florida Supreme Court dismissed as procedurally barred Stewart's ineffective assistance of appellate counsel claim for failure to challenge the trial counsel's concession of guilt because that claim should have been raised in the 3.850 motion.  Id. at 531-32.

**G. Federal Habeas Proceedings**

On May 31, 2005, Stewart filed a petition for a writ of habeas corpus in the United States District Court for the Middle District of Florida under 28 U.S.C. § 2254.  On February 6, 2006, the district court rejected all twenty-seven grounds raised by Stewart and denied his § 2254 petition.  Stewart timely appealed, and we granted a certificate of appealability as to whether trial counsel was ineffective in failing to: (1) provide Dr. Afield with all available information to identify mitigating circumstances; and (2) adequately investigate and prepare mitigating

30

evidence during the penalty phase, including but not limited to evidence about Stewart's childhood.

## III. STANDARD OF REVIEW

When examining a district court's denial of a § 2254 habeas petition, we review questions of law and mixed questions of law and fact de novo, and findings of fact for clear error. Maharaj v. Sec'y for Dep't of Corr., 432 F.3d 1292, 1308 (11th Cir. 2005), cert. denied, __ U.S. __, 127 S. Ct. 348 (2006). However, review of a final state habeas judgment pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), is "greatly circumscribed and highly deferential to the state courts." Crawford v. Head, 311 F.3d 1288, 1295 (11th Cir. 2002).

First, § 2254(e)(1) sets a deferential standard of review for factual determinations made by a state court, stating that "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Marquard v. Sec'y for Dep't of Corr., 429 F.3d 1278, 1303 (11th Cir. 2005), cert. denied, __ U.S. __, 126 S. Ct. 2356 (2006).

Second, § 2254(d) allows federal habeas relief for a claim adjudicated on the merits in state court only if the state court adjudication resulted in a decision that was: "(1) . . . contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Marquard, 429 F.3d at 1303. The phrase "clearly established Federal law," as used in § 2254(d)(1), encompasses only the holdings, as opposed to the dicta, of the United States Supreme Court as of the time of the relevant state court decision. See Carey v. Musladin, 549 U.S. __, 127 S. Ct. 649, 653 (2006) (citing Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523 (2000)); Osborne v. Terry, 466 F.3d 1298, 1305 (11th Cir. 2006).

## IV. DISCUSSION

### A. General Legal Principles

The Supreme Court established the standards governing ineffective assistance of counsel claims in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). To prevail, a habeas petitioner must show that: (1) counsel's performance was deficient because it fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the defense. Id. at

32

687-88, 104 S. Ct. at 2064; <u>Grayson v. Thompson</u>, 257 F.3d 1194, 1215 (11th Cir. 2001).

The standard for judging counsel's performance is "'reasonableness under prevailing professional norms.'" <u>Chandler v. United States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000) (<u>en banc</u>) (quoting <u>Strickland</u>, 466 U.S. at 688, 104 S. Ct. at 2065). The test for reasonableness is not whether counsel could have done something more or different; instead, we must consider whether the performance fell within the broad range of reasonable assistance at trial. <u>Id.</u> Furthermore, we recognize that "omissions are inevitable. But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" <u>Id.</u> (quoting <u>Burger v. Kemp</u>, 483 U.S. 776, 794, 107 S. Ct. 3114, 3126 (1987)).

The burden of persuasion is on the petitioner to prove by a preponderance of the evidence that counsel's performance was unreasonable. <u>Id.</u> Courts conduct highly deferential review of counsel's performance and "'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" <u>Id.</u> at 1314 (quoting <u>Strickland</u>, 466 U.S. at 689-90, 104 S. Ct. at 2065-66); <u>see also</u> <u>Williams v. Head</u>, 185 F.3d 1223, 1235 (11th Cir. 1999) (quoting same language

33

from Strickland).[25]  Based on this strong presumption of competent assistance, the petitioner's burden of persuasion is a heavy one: "petitioner must establish that no competent counsel would have taken the action that his counsel did take." Chandler, 218 F.3d at 1315.  In considering claims that counsel was ineffective at the penalty phase of trial, we determine "whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court."  Henyard v. McDonough, 459 F.3d 1217, 1242 (11th Cir. 2006).

As for the second prong of the Strickland test, "[a] petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high."  Van Poyck v. Fla. Dep't of Corr., 290 F.3d 1318, 1322 (11th Cir. 2002). "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."  Strickland, 466 U.S. at 693, 104 S. Ct. at 2067.  Instead, when a petitioner challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  Id. at 695, 104 S. Ct. at 2069.

---

[25]"When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." Chandler, 218 F.3d at 1316.  We note that Barbas was an experienced defense attorney who had previously prosecuted first-degree murder cases as an assistant state attorney in Florida and defended death penalty cases in private practice prior to serving as Stewart's trial counsel.

34

**B. Counsel's Failure to Provide Information to Dr. Afield**

Stewart contends that his trial counsel was ineffective in failing to provide Dr. Afield, the defense mental health expert, all information necessary to identify mitigating circumstances. Specifically, Stewart asserts that his trial counsel failed to provide Dr. Afield with evidence of: (1) Mr. Scarpo's alleged abuse; (2) Stewart's teenage suicide attempt; and (3) Stewart's longstanding alcohol and drug abuse. Stewart argues that this failure was a product of neglect, not a trial strategy, and that his trial counsel thus rendered ineffective assistance.

The state 3.850 court rejected these claims after an evidentiary hearing. As to Stewart's alcohol abuse and suicide attempts, the state 3.850 court found that trial counsel gave Dr. Afield information that Stewart had been drinking heavily, approximately a fifth of whiskey, on the day of the murder; that Barbas was aware of Stewart's suicide attempts in jail; and that Dr. Afield testified about that in the penalty phase. The state 3.850 court also found that Stewart never told trial counsel that he had suffered any type of abuse by Mr. Scarpo. The state 3.850 court also noted that Dr. Afield interviewed and tested Stewart, reviewed documentation concerning Stewart's psycho-social history, and provided adequate mental health assistance. The Florida Supreme Court affirmed the denial of Stewart's 3.850 motion, finding that trial counsel's preparation of Dr. Afield was

35

not deficient.  See Stewart v. State, 801 So. 2d at 70.  After review, we conclude that the Florida Supreme Court's decision on this issue was neither "contrary to," nor "an unreasonable application of," clearly established federal law.

Stewart's primary contention is that Barbas's failure to provide Dr. Afield with evidence of Mr. Scarpo's alleged abuse left the jury with an inaccurate view of Stewart's upbringing.  Stewart concedes that Barbas did not know about this abuse, but Stewart claims that information about Mr. Scarpo's mistreatment was readily available from witnesses who testified at the state 3.850 proceeding, particularly his stepsisters and aunt.  Although Stewart admits that he did not personally tell Barbas about this abuse, Stewart contends that he could not be expected to inform Barbas about his childhood given his psychological disorders and uncommunicative state.

For several reasons, these arguments are meritless.  First, Barbas provided Dr. Afield with ample material for the psychiatrist to make an informed opinion on Stewart's mental health.  Before Dr. Afield's testimony in the penalty phase, Barbas supplied Dr. Afield with the competency evaluations of the two clinical psychologists at the competency hearing; medical records and other documents; and information gleaned from Barbas's interviews with Stewart and other witnesses, including details about Stewart's background and the circumstances of

36

Harris's murder. Additionally, Dr. Afield met with Stewart three times, conducted psychological and neurological testing, consulted with the clinical psychologists who had evaluated Stewart, and listened to Mr. Scarpo's penalty phase testimony. After reviewing all information, Dr. Afield provided his "emphatic" expert opinion during the penalty phase that Stewart had diminished capacity to conform his conduct to the law. Dr. Sultan, Stewart's mental health expert at the state 3.850 proceedings, largely confirmed Dr. Afield's diagnosis and denied stating that Dr. Afield could not render an accurate opinion with the information he had on hand.

Second, and more importantly, Stewart never informed Barbas about any abuse or mistreatment by Mr. Scarpo. "The reasonableness of a trial counsel's acts, including lack of investigation . . ., depends critically upon what information the client communicated to counsel." Chandler, 218 F.3d at 1324 (internal quotation marks omitted); see also Van Poyck, 290 F.3d at 1325 ("Information supplied by a petitioner is extremely important in determining whether a lawyer's performance is constitutionally adequate."). Because information about childhood abuse supplied by a defendant is "extremely important" in determining reasonable performance, "[w]hen a petitioner (or family members petitioner directs his lawyer to talk to) [does] not mention a history of physical abuse, a lawyer is not ineffective for failing to discover or to offer evidence of abuse as mitigation."

37

Van Poyck, 290 F.3d at 1325; see also Williams v. Head, 185 F.3d at 1237 ("An attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him.").

In this case, the state 3.850 court's finding that Stewart never told trial counsel that he suffered abuse by Mr. Scarpo is entitled to a presumption of correctness and defeats Stewart's ineffective assistance claim. Indeed, the record is clear that despite frequent interaction between Stewart and his trial attorney prior to the penalty phase, Stewart never mentioned Mr. Scarpo's alleged abuse. Barbas provided uncontested testimony in the state 3.850 proceeding that Stewart never told him about any abuse or mistreatment by Mr. Scarpo. Stewart does not dispute that he never told Barbas about the abuse during the nine months that Barbas represented him prior to trial.

In fact, Barbas testified that Stewart indicated "[j]ust the opposite" of poor treatment by Mr. Scarpo in conversations with Stewart. Furthermore, Stewart never contradicted Mr. Scarpo's penalty phase depiction of Stewart's happy childhood in the Scarpo household. The Constitution imposes no burden on counsel to scour a defendant's background for potential abuse given the defendant's contrary representations or failure to mention the abuse. See Henyard, 459 F.3d at 1245 (denying ineffective assistance claim for failure to uncover

38

evidence of sexual abuse in childhood where the defendant repeatedly denied a history of sexual abuse); Callahan v. Campbell, 427 F.3d 897, 934-35 (11th Cir. 2005), cert. denied, __ U.S. __, 127 S. Ct. 427 (2006) (finding that counsel performed reasonably despite a failure to investigate the possibility of childhood abuse where the defendant never mentioned any abuse); Van Poyck, 290 F.3d at 1324-25 (concluding that counsel was not ineffective by failing to investigate childhood and prison abuse based on the defendant's denial that he had been abused).

Although Stewart argues that his failure to mention Mr. Scarpo's alleged abuse to Barbas is excused by his inability to communicate with counsel, the state trial court found that Stewart was competent to proceed to trial, and this finding is entitled to a presumption of correctness. Stewart relies on Dr. Afield's competency hearing opinion that Stewart was uncommunicative. However, Stewart's effort fails because two other mental health experts (clinical psychologists) examined and evaluated Stewart for the competency hearing and found him to be cooperative and coherent.[26] Barbas's testimony in the 3.850 hearing that Stewart was communicative and coherent in their attorney-client discussions corroborates these expert opinions. Accordingly, we agree with the Florida Supreme Court's

_____

[26]In fact, Dr. Mussenden's August 1986 competency evaluation reveals that Stewart provided extensive details about his family background, work history, substance abuse problems, and criminal history when he met with Dr. Mussenden.

determination that Stewart's failure to tell either his trial counsel or his defense mental health expert about childhood abuse precludes his claim about that childhood abuse. See Stewart v. State, 801 So. 2d at 67.

Third, despite Barbas's extensive investigation into potential mitigation witnesses, no family witness provided information about Mr. Scarpo's alleged abuse. Barbas testified in the state 3.850 proceedings that he personally interviewed Stewart's stepfather, stepmother, stepsisters, aunt, and grandparents.[27] It is undisputed that none of these family members informed Barbas of any abuse or mistreatment by Mr. Scarpo. Furthermore, Barbas's lead investigator, Mr. Fernandez, personally interviewed Stewart's stepsisters, and his interview notes corroborate his state 3.850 hearing testimony that neither stepsister mentioned Mr. Scarpo's alleged abuse. In their state 3.850 evidentiary hearing testimony, the stepsisters also confirmed that they never told either Barbas or Mr. Fernandez about the alleged abuse.

Instead of describing a history of abuse, family members who testified at the penalty phase described Stewart's childhood as being harmonious and happy. Mr.

---

[27]Stewart attempts to rebut Barbas's claim that he personally interviewed each mitigation witness prior to trial by noting his motion seeking a continuance on August 22, 1986. In arguing for a continuance because of Mr. Fernandez's heart attack, Barbas claimed that Mr. Fernandez was "most familiar" with the mitigation witnesses. We fail to see how this statement is inconsistent with Barbas's state 3.850 hearing testimony detailing his own diligent efforts to investigate mitigation evidence prior to trial.

Scarpo claimed that Stewart had a typical childhood and blended in well with the happy Scarpo household. Joanne Scarpo, his stepmother, described Stewart as a jovial child who idolized his stepfather. Even Medlin, who later claimed that Mr. Scarpo abused Stewart, detailed Stewart's upbringing in the Scarpo household without mentioning any abuse or mistreatment. Moreover, as noted above, Stewart himself never mentioned any childhood abuse to either Barbas, Mr. Fernandez, or even Dr. Afield.

Although Mr. Fernandez's notes indicate that Engle once mentioned hearing that Mr. Scarpo abused Stewart, Mr. Fernandez did not remember receiving any indication of abuse. More importantly, Engle did not mention this abuse directly to Barbas despite having an opportunity to do so. Barbas testified, and his billing records confirm, that he spoke with Engle prior to the penalty phase. Given the repeated statements by family members and Stewart himself painting a contrary picture of Stewart's happy childhood in the Scarpo household, Engle's solitary mention of abuse to the investigator, Mr. Fernandez, is not sufficient to establish deficiency of counsel in providing information to the defense mental health expert. See Henyard, 459 F.3d at 1245 (concluding that trial counsel's failure to discover evidence of sexual abuse was not deficient given repeated denials of any abuse,

41

despite trial counsel's note indicating that the defendant once mentioned sexual abuse).[28]

Fourth, Barbas was not alerted to Mr. Scarpo's alleged abuse by other sources. Both Barbas and Dr. Afield reviewed the competency reports prepared by two clinical psychologists for the competency hearing before trial, and neither report references any abuse by Mr. Scarpo. Additionally, none of the medical reports or jail records indicate any mistreatment by Mr. Scarpo. See id. (reasoning that trial counsel's failure to uncover sexual abuse evidence was not deficient where defendant never mentioned sexual abuse to his psychological experts); Williams v. Head, 185 F.3d at 1237 (concluding that trial counsel was not deficient when neither the defendant, the defendant's mother, nor other witnesses mentioned any mistreatment suffered by the defendant).

Stewart also contends that Barbas performed deficiently in failing to provide Dr. Afield with Stewart's juvenile court records, which would have revealed evidence of an adolescent suicide attempt and the early onset of substance abuse. Stewart has provided no evidence that Dr. Afield did not have these records, however. Although Barbas did not recall any teenage suicide attempt, he obtained

---

[28]Similarly, we give no weight to the unsigned, undated note found in Barbas's and Mr. Fernandez's case files. No party could explain the origin or timing of this note, and both Barbas and Mr. Fernandez testified that they did not see the note prior to trial. The validity of the unsigned, undated note is highly questionable because its descriptions of Mr. Scarpo's abuse conflict sharply with the other evidence in the investigative files.

a court order two months prior to Stewart's trial to receive these juvenile records from the South Carolina Department of Youth Services. Moreover, in the state 3.850 evidentiary hearing, Dr. Afield testified that he was aware of Stewart's suicide attempts and alcohol and drug abuse prior to testifying in the penalty phase. Dr. Afield's testimony in the penalty phase corroborates his state 3.850 testimony–he noted that Stewart "trie[d] to kill himself a few times," and he mentioned Stewart drinking alcohol on the day of the murder.

Even if Barbas did not obtain these juvenile court records, this failure would not be unreasonable in light of Stewart's failure to apprise Barbas of the teenage suicide attempt.[29] Barbas extensively interviewed Stewart's family members and other mitigation witnesses, but there is no evidence that any witness mentioned a teenage suicide attempt. None of the competency reports reference a teenage suicide attempt. A November 1980 psychological evaluation by Dr. Gerald Mussenden, Ph. D., a clinical psychologist, mentions no teenage suicide attempt,

---

[29]Stewart also claims that Barbas's failure to obtain prior conviction records is deficient performance under Rompilla v. Beard, 545 U.S. 374, 125 S. Ct. 2456 (2005). In Rompilla, trial counsel failed to review their client's prior conviction record even though they knew that the prosecutor planned to present damaging testimony from this record at trial. Although the Supreme Court held that trial counsel performed deficiently in such circumstances, it explicitly refused to establish a per se rule requiring defense counsel to do a thorough review of all prior conviction files. Id. at 385-90, 125 S. Ct. at 2465-67.

Moreover, the circumstances here are a far cry from Rompilla. Here, the state did not present either Stewart's prior juvenile conviction record itself or testimony from this conviction in the penalty phase, and thus Barbas was not on notice of any need to review potentially damaging evidence from the conviction record.

and that report was prepared only a year after the alleged attempt in 1979.[30]

Additionally, there is no record of Stewart mentioning a teenage suicide attempt to Barbas. Because the reasonableness of trial counsel's mitigation efforts depends "critically" upon information communicated by the client, Barbas's alleged failure to provide evidence of a teenage suicide attempt to Dr. Afield was not deficient given his client's silence on the matter. Van Poyck, 290 F.3d at 1325; Chandler, 218 F.3d at 1324; Williams v. Head, 185 F.3d at 1237.

Stewart's contention that Barbas failed to provide Dr. Afield with evidence of Stewart's chronic alcohol and drug abuse is also unavailing. The state 3.850 court and the Florida Supreme Court determined that both Barbas and Dr. Afield were aware of Stewart's substance abuse prior to trial. See Stewart v. State, 801 So. 2d at 66 n.7. The record unquestionably supports this finding.

First, Barbas testified in the state 3.850 hearing that he informed Dr. Afield of Stewart's alcohol and drug use and described Stewart's alcohol consumption on the day of Harris's murder.

Second, the competency reports supplied to Dr. Afield clearly detail Stewart's alcohol and drug consumption. Dr. Mussenden's November 1980

---

[30]Barbas was clearly aware of this earlier psychological evaluation prior to trial because he questioned Dr. Mussenden about the November 1980 evaluation at the August 1986 competency hearing. At the state 3.850 hearing, Dr. Afield also testified that he reviewed all of Stewart's prior competency evaluations.

44

psychological evaluation, which was discussed at the August 1986 competency hearing, indicated that Stewart began consuming alcohol and illegal drugs in the sixth grade and detailed the type of illegal drugs that Stewart regularly used. Dr. Mussenden's August 1986 competency evaluation noted that Stewart admitted that he was an alcoholic, recorded his daily intake of whiskey and cocaine, and opined that Stewart had no control over his alcohol and drug intake. Based on these psychological reports alone, Dr. Afield had ample information about Stewart's substance abuse problem.

Finally, Dr. Afield testified at the state 3.850 hearing that he was aware of Stewart's alcohol and drug problems, and his penalty phase testimony confirms this knowledge. At the state 3.850 hearing, Dr. Afield pointed to his penalty phase testimony about Stewart drinking whiskey at his mother's grave as an attempt to convey Stewart's substance abuse problems to the jury.

Based on the information provided by Barbas, Dr. Afield had extensive details about the origins of Stewart's alcohol and drug abuse, his regular consumption levels, and his intake on the day of Harris's murder. The Florida Supreme Court's conclusion that Barbas did not perform deficiently in this regard is not objectively unreasonable.

Even assuming arguendo that Barbas performed deficiently on all grounds asserted by Stewart, Stewart still has not satisfied his high burden of proving prejudice under the Strickland framework. Dr. Afield provided "emphatic" testimony in the penalty phase that Barbas suffered childhood abuse and antisocial personality disorders manifested in his alcohol use and suicide attempts. Stewart provides nothing more than mere speculation that providing Dr. Afield with information about Mr. Scarpo's alleged abuse would have altered Dr. Afield's penalty phase testimony.

In fact, Dr. Afield testified in the state 3.850 hearing that information about Mr. Scarpo's alleged abuse "wouldn't have made any difference" in his final opinion.[31] Even if information about Mr. Scarpo's abuse could have bolstered the credibility of Dr. Afield's opinion, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693, 104 S. Ct. at 2067. We thus agree with the state 3.850 court's and Florida Supreme Court's conclusions that Stewart has failed to show any prejudice. Stewart v. State, 801 So. 2d at 67 n.10.

---

[31]Stewart's own mental health expert witness in the state 3.850 proceeding, Dr. Sultan, undermines Stewart's claim that Dr. Afield would have altered his opinion with more information. After reviewing additional material about Mr. Scarpo's abuse, Stewart's teenage suicide attempt, and Stewart's longstanding substance abuse problem, Dr. Sultan provided a nearly identical opinion of Stewart's antisocial disorders as presented in Dr. Afield's penalty phase testimony.

46

Similarly, even assuming arguendo that Barbas performed deficiently by failing to provide Dr. Afield with evidence of Stewart's teenage suicide attempt and substance abuse problem, Stewart has not demonstrated prejudice. Dr. Afield specifically testified in the penalty phase that Stewart's efforts to "kill himself a few times" indicated his extreme disturbance. Even if this mention of multiple suicide attempts did not refer specifically to the teenage suicide attempt, Stewart has failed to show that evidence of one more suicide attempt would alter this diagnosis. Dr. Afield also testified in the penalty phase that Stewart demonstrated severe disturbance by drinking whiskey at his mother's grave. Stewart again has not shown a reasonable probability that Dr. Afield would have modified his opinion if he had more information about Stewart's alcohol and drug abuse.

For all of these reasons, the Florida Supreme Court's determination that Stewart failed to establish either deficient performance or prejudice as to Barbas's preparation of Dr. Afield was not contrary to or an unreasonable application of clearly established federal law.

## C. Failure to Investigate and Prepare Mitigating Evidence

We next address Stewart's ineffective assistance of counsel claim based on Barbas's failure to investigate and prepare mitigating evidence at the penalty phase of trial. While Stewart's first claim is about inadequate mitigating information

47

being provided to Dr. Afield, the second claim is about inadequate mitigation information being investigated and presented to the jury. Specifically, Stewart argues that his trial counsel failed to present readily available evidence of Mr. Scarpo's alleged abuse and Stewart's longstanding substance abuse problem to the jury at the penalty phase.

The state 3.850 court rejected these claims, finding that Stewart had failed to establish prejudice from Barbas's failure to present this evidence to the jury. The state 3.850 court ruled on only the prejudice prong. On appeal, the Florida Supreme Court ruled on the performance prong and determined that Barbas conducted a diligent investigation and presented appropriate mitigating evidence at the penalty phase. Id. at 68. The Florida Supreme Court held that "the investigation and presentation of mitigating evidence in this case was well within the realm of constitutionally adequate assistance of counsel." Id. We fully agree, and, at a minimum, the Florida Supreme Court's determination on the performance prong is not objectively unreasonable.

Similar to the claim that Barbas provided Dr. Afield with inadequate information, Stewart's core argument is that Barbas failed to present evidence of Mr. Scarpo's alleged mistreatment of Stewart to the jury in the penalty phase. Stewart asserts that Barbas's lack of knowledge about the abuse does not excuse

48

his failure because obvious mitigation witnesses, like Stewart's stepsisters and aunt, could have provided detailed accounts of the abuse. As a result, Stewart contends that the jury received a romanticized portrayal of his upbringing in the Scarpo household that undercut potentially crucial mitigating evidence.

We again reject these arguments for several reasons. First, Barbas's failure to present evidence of Mr. Scarpo's alleged abuse was not deficient because Stewart did not inform Barbas of this abuse. We agree with the Florida Supreme Court's determination that Barbas performed reasonably given his client's failure to mention Mr. Scarpo's abuse. Stewart v. State, 801 So. 2d at 67. The fault for any failure to discover Mr. Scarpo's alleged abuse lies with Stewart himself. See Williams v. Head, 185 F.3d at 1237.

Second, as the Florida Supreme Court noted, Barbas conducted extensive preparation for the penalty phase. Barbas compiled a list of potential mitigation witnesses after speaking with Stewart and Mr. Scarpo, and Barbas hired an investigation team[32] that was "very experienced in researching and investigating mitigation issues for capital cases." Id. at 66. Mr. Fernandez conducted preliminary interviews with Stewart's family members, friends, school counselor,

[32]Stewart contests the Florida Supreme Court's factual finding that Barbas hired two investigators, asserting that Mr. Fernandez was the only investigator to work on Stewart's case. Even if we assume that Mr. Fernandez was the sole investigator to devote time to Stewart's penalty phase, Stewart does not dispute the Florida Supreme Court's description of the diligent work conducted by Mr. Fernandez.

and pastor. Following this initial research, Barbas testified that he personally interviewed witnesses, including Stewart's stepfather, stepmother, stepsisters, aunt, and grandparents, as well as Engle and LaRue. Barbas also hired Dr. Afield as a mental health expert to conduct a thorough psychological evaluation of Stewart and testify about the emotional disturbance caused by Stewart's childhood abuse by his biological mother.

Based on information gleaned from this pretrial work, Barbas presented ample testimony highlighting Stewart's abuse under his biological mother's care and the trauma Stewart suffered at age thirteen upon learning tragic details about his family. Through the testimony of Stewart's family and friends, Barbas portrayed Stewart as a tortured adolescent soul who struggled to conform his conduct to the law. Barbas also presented the testimony of Dr. Afield, who forcefully argued that Stewart suffered extreme emotional disturbance that hampered his ability to control his actions. Based on Barbas's diligent penalty phase preparation and vigorous argument to the jury, we agree with the Florida Supreme Court's determination that Barbas's presentation of mitigating evidence was "constitutionally adequate assistance . . . ." Id. at 68.

Third, even if Barbas had known about the abuse, Stewart's stepsisters refused to testify at trial. At the state 3.850 hearing, Mr. Fernandez testified, and

50

his interview notes confirm, that both stepsisters did not want to testify at Stewart's penalty phase due to work obligations. Without the testimony of Stewart's stepsisters, Barbas would have struggled to present evidence of Mr. Scarpo's abuse even if he were aware of any mistreatment. Because Stewart's stepsisters were unwilling to testify, Barbas could not be faulted for failing to present their testimony about Mr. Scarpo's abuse even if he had known about it.[33]

Stewart next asserts that Barbas was unaware of the longstanding nature of Stewart's drug and alcohol abuse and, as a result, failed to present this evidence to the jury. Stewart claims that this failure was not a tactical decision because Barbas did not know about Stewart's longstanding substance abuse problem. According to Stewart, if the jury had evidence of Stewart's substance abuse problem, it would have viewed Stewart in a more sympathetic light.

As discussed above, the Florida Supreme Court properly determined that Barbas was well aware of Stewart's alcohol and drug abuse. Stewart v. State, 801 So. 2d at 66 n.7. Dr. Mussenden's competency and psychological evaluations provided ample details about the early roots of Stewart's problem and the extent of

---

[33]We also note that even if Stewart's stepsisters had been willing to testify, Barbas could have reasonably declined to present their testimony about abuse as part of his trial strategy. On cross-examination during the state 3.850 hearing, both stepsisters conceded that they had never been convicted of any crime despite suffering similar abuse as Stewart had endured in the Scarpo household. This testimony could have crippled the defense strategy of arguing that Stewart's abusive background led inexorably to criminal acts. See Robinson v. Moore, 300 F.3d 1320, 1348 (11th Cir. 2002).

51

his alcohol and drug intake. Stewart's assertion that Barbas was unaware of Stewart's longstanding alcohol and drug use is unsupported by the record.

Further, Barbas's decision not to present evidence of Stewart's drug and alcohol abuse is afforded a "strong presumption" of reasonableness, and Barbas did not perform deficiently for several reasons. Chandler, 218 F.3d at 1314; see also Fugate v. Head, 261 F.3d 1206, 1223-24 (11th Cir. 2001) (noting that we avoid second-guessing counsel's strategic decisions with the benefit of hindsight).

First, reasonably competent counsel may not present such evidence because a detailed account of a defendant's alcohol and drug abuse is invariably a "two-edged sword." Housel v. Head, 238 F.3d 1289, 1296 (11th Cir. 2001) (internal quotation marks omitted). We have repeatedly recognized that evidence of a defendant's alcohol or drug abuse holds little mitigating value and may have the counterproductive effect of alienating the jury. See, e.g., Haliburton v. Sec'y for Dept. of Corr., 342 F.3d 1233, 1244 (11th Cir. 2003) ("[E]vidence [of substance abuse] can often hurt the defense as much or more than it can help."); Crawford, 311 F.3d at 1321 ("[S]uch evidence often has little mitigating value and can do as much or more harm than good in the eyes of the jury."); Grayson, 257 F.3d at 1227 ("[W]e note that emphasizing [the petitioner's] alcoholic youth and intoxication may also have been damaging to [the petitioner] in the eyes of the

jury."). Rarely, if ever, will evidence of a long history of alcohol and drug abuse be so powerful that every objectively reasonable lawyer who had the evidence would have used it. Cf. Van Poyck, 290 F.3d at 1324 (concluding that evidence of childhood abuse is not so powerful that every reasonable lawyer would have presented it to a jury).

Second, at the state 3.850 hearing, although Barbas was not asked about his strategy for addressing Stewart's substance abuse at the penalty phase, Stewart's 3.850 counsel questioned Barbas about his decision not to present this evidence to establish a voluntary intoxication defense in the guilt phase. Barbas testified that he deliberately chose not to present such evidence because he believed that it would have opened the door to damaging testimony from Dr. Mussenden, including testimony about Stewart's detailed recollection of Harris's murder. Such testimony from Dr. Mussenden might have undercut the defense strategy of portraying Stewart as incapable of conforming his conduct to the law when he murdered Harris.

Similarly, any potential mitigating value of Stewart's substance abuse would have been offset by Dr. Mussenden's testimony at the penalty phase. See Rutherford v. Crosby, 385 F.3d 1300, 1311 (11th Cir. 2004), cert. denied, 544 U.S. 982, 125 S. Ct. 1847 (2005) (concluding that counsel's decision not to present

evidence of defendant's alcoholism was reasonable because such evidence would have opened the door to evidence about defendant's past violence); Hubbard v. Haley, 317 F.3d 1245, 1260 (11th Cir. 2003) (upholding state court finding that counsel performed reasonably in not presenting evidence of alcoholism because such evidence would have been "more than offset" by mental health records indicating that defendant suffered no mental defect).

Third, evidence of Stewart's substance abuse also would have undermined the defense strategy of establishing childhood trauma at age thirteen as the trigger point to violence. At the penalty phase, Mr. Scarpo and Hayward testified that Stewart learned at age thirteen about his biological mother's suicide, his biological father's death in a bar fight, his uncle's murder, and two aunts' deaths in a car accident. Mr. Scarpo testified that Stewart became a bitter child filled with animosity after these revelations. Medlin and Joanne Scarpo testified that Stewart was grief-stricken at age thirteen upon learning that Mr. Scarpo was not his biological father, and Stewart had his first criminal convictions soon after this revelation. Dr. Afield testified that these tragic revelations at age thirteen were "the final blow" and the "trigger" for Stewart's future violence.

While Barbas built a convincing argument that Stewart's severe emotional disturbance at age thirteen led inexorably to violence, Stewart's early alcohol and

drug use preceded this alleged "trigger" point. Dr. Mussenden's November 1980 psychological evaluation indicated that Stewart began using alcohol and drugs in sixth grade, at least a year before the "trigger" age of thirteen. As a result, Barbas could not have argued that the drug and alcohol abuse was a product of Stewart's suffering following the tragic revelations about his family. Evidence of Stewart's drug and alcohol abuse before age thirteen thus would have weakened Barbas's forceful argument that tragic family circumstances beyond Stewart's control at age thirteen set in motion Stewart's violent behavior.

Accordingly, Barbas performed reasonably in deciding not to present evidence of Stewart's longstanding alcohol and drug abuse to the jury. Therefore, we conclude that the Florida Supreme Court's determination that Barbas presented appropriate mitigation evidence was not objectively unreasonable.

Alternatively, Stewart has not demonstrated prejudice arising from the failure to present evidence of Mr. Scarpo's abuse or Stewart's alcohol and drug use. In the penalty phase, Barbas presented detailed accounts of Stewart's childhood abuse and suffering at the hands of his biological mother. Based on Mr. Scarpo's testimony about this mistreatment, Dr. Afield forcefully argued to the jury that Stewart had been programmed for violence by age five and could not conform his conduct to the law. Dr. Afield also mentioned Barbas's drinking at his

55

mother's grave as an indication of severe disturbance. Based on this evidence, the state trial court found Stewart's extreme disturbance and diminished capacity to appreciate the criminality of his conduct as mitigating factors.

In light of the penalty phase evidence of abuse inflicted by Stewart's biological mother, we agree with the state 3.850 court and Florida Supreme Court that similar evidence of Mr. Scarpo's abuse would not have impacted sentencing or produced a different result. See Stewart v. State, 801 So. 2d at 67 n.10; see also Van Poyck, 290 F.3d at 1324 (finding no ineffective assistance of counsel when evidence missing from the penalty phase was "merely cumulative"). Stewart has also failed to establish how additional evidence of Stewart's substance abuse beyond Dr. Afield's testimony about his drinking would have altered sentencing. Aside from unsupported assertions about potential effects on the jury, Stewart points to nothing in the record that would bring into question the state 3.850 court's finding of no prejudice.

Finally, none of this evidence counters the clear aggravating factors in this case: (1) Stewart's commission of the murder during a robbery; and (2) Stewart's prior convictions for violent felonies, including attempted first-degree murder.[34]

_____

[34]We also note that if this case were remanded for resentencing, the state trial court would have more damaging evidence of Stewart's other violent conduct. In particular, the trial court could consider Stewart's conviction and death sentence for Stewart's murder of Ruben Diaz. See Stewart v. State, 558 So. 2d at 418-19 (detailing the Diaz murder and trial).

Weighed against these heavy aggravating circumstances, Stewart has not satisfied his high burden of proving that the sentencing outcome would have been different if the jury had evidence of Mr. Scarpo's abuse or his longstanding substance abuse problem.

## V. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Stewart's 28 U.S.C. § 2254 petition.

**AFFIRMED.**